T.C. Memo. 2010-249

UNITED STATES TAX COURT

RONALD B. AND HELEN J. SUNDRUP, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14373-07, 14374-07,     Filed November 16, 2010.
        14379-07.

<u>Frank W. Pechacek, Jr.</u>, and <u>Jamie L. Cox</u>, for petitioners.

<u>Stephen A. Haller</u> and <u>James A. Kutten</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-

ciencies in, and accuracy-related penalties under section

---

[1]Cases of the following petitioners are consolidated here-
with:  Sundrup Transfer, Inc., docket No. 14374-07; and Sundrup
Consulting, Inc., docket No. 14379-07.

6662(a)[2] on, the respective Federal income tax (tax) of (1) Ronald B. and Helen J. Sundrup, (2) Sundrup Transfer, Inc., and (3) Sundrup Consulting, Inc.:

| Petitioner | Taxable Year | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| Ronald B. and Helen J. Sundrup | 2003 | $19,129 | $3,825.80 |
| | 2004 | 17,956 | 3,591.20 |
| | 2005 | 14,999 | 2,999.80 |

| Petitioner | Taxable Year Ended Mar. 31 | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| Sundrup Transfer, Inc. | 2004 | $2,361 | $472.20 |
| | 2005 | 1,776 | 355.20 |
| | 2006 | 843 | 168.60 |

| Petitioner | Taxable Year Ended Mar. 31 | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| Sundrup Consulting, Inc. | 2004 | $10,030 | $2,006 |
| | 2005 | 7,875 | 1,575 |
| | 2006 | 8,250 | 1,650 |

In amendments to answers filed in the respective cases at docket Nos. 14373-07 and 14374-07, respondent alleged the following respective increased deficiencies in, and increased accuracy-related penalties under section 6662(a) on, the respective taxes of (1) Ronald B. and Helen J. Sundrup and (2) Sundrup Transfer, Inc.:

---

[2]All section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

| Petitioner | Taxable Year | Increased Deficiency | Increased Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| Ronald B. and Helen J. Sundrup | 2003 | $24,897 | $4,979.40 |
| | 2004 | 19,000 | 3,800.00 |
| | 2005 | 15,548 | 3,109.60 |

| Petitioner | Taxable Year Ended Mar. 31 | Increased Deficiency | Increased Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| Sundrup Transfer, Inc. | 2004 | $7,917 | $1,583.40 |
| | 2005 | 6,543 | 1,308.60 |
| | 2006 | 6,218 | 1,243.60 |

The issues remaining for decision are:[3]

(1) Should certain transactions during each of petitioners' respective taxable years at issue between (a) Sundrup Transfer, Inc., and Sundrup Consulting, Inc., (b) Sundrup Leasing, L.L.C., and Sundrup Consulting, Inc., and (c) Ronald B. and Helen J. Sundrup and Sundrup Consulting, Inc., be respected for tax purposes for each of those years? We hold that they should not.[4]

---

[3]In addition to the issues remaining for decision that are listed in the text, there are certain other questions relating to certain determinations in the respective notices of deficiency that respondent issued to petitioners which are computational in that their resolution flows from our resolution of certain of the issues that we address herein.

[4]In the light of our holdings with respect to certain respective transactions between (1) Sundrup Transfer, Inc., and Sundrup Consulting, Inc., (2) Sundrup Leasing, L.L.C., and Sundrup Consulting, Inc., and (3) Ronald B. and Helen J. Sundrup and Sundrup Consulting, Inc., we need not address certain determinations that respondent made in the respective notices of deficiency that respondent issued to Ronald B. and Helen J. Sundrup and Sundrup Consulting, Inc., because respondent indicates on brief that respondent's position with respect to those other determinations is alternative to respondent's position with respect to those certain transactions. See infra notes 70 and 75.

(2)  Is petitioner Sundrup Transfer, Inc., entitled for its taxable year ended March 31, 2004, to deduct under section 162(a) certain medical and dental expenses?  We hold that it is.

(3)  Is Sundrup Transfer, Inc., entitled for each of its taxable years ended March 31, 2004 and 2006, to deduct under section 162(a) certain miscellaneous expenses?  We hold that it is not.

(4)  Is Sundrup Leasing, L.L.C., entitled for each of its taxable years 2003 through 2005 to deduct under section 162(a) certain amounts that it paid relating to certain real properties?[5]  We hold that it is not.

(5)  Are petitioners (a) Ronald B. and Helen J. Sundrup, (b) Sundrup Transfer, Inc., and (c) Sundrup Consulting, Inc., liable for each of their respective taxable years at issue for accuracy-related penalties under section 6662(a)?  We hold that they are.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

At all relevant times since around 1964, including at the time petitioners Ronald B. Sundrup (Mr. Sundrup) and Helen J.

---

[5]Sundrup Leasing, L.L.C., was a passthrough entity for tax purposes for each of its taxable years 2003, 2004, and 2005.  As a result, any deduction that it claimed for each of those years in effect flowed through to its members, petitioners Ronald B. and Helen J. Sundrup.  See infra note 50.

Sundrup (Ms. Sundrup)[6] filed the petition in the case at docket No. 14373-07 and throughout the years at issue, Mr. and Ms. Sundrup resided at 200 Corning Street, Arcadia, Iowa (Arcadia), which is in Carroll County, Iowa (Carroll County).

At all relevant times, including at the time petitioner Sundrup Transfer, Inc. (Transfer), filed the petition in the case at docket No. 14374-07 and throughout the years at issue, Transfer maintained its principal place of business at 200 Corning Street, Arcadia.

At all relevant times, including at the time petitioner Sundrup Consulting, Inc. (Consulting), filed the petition in the case at docket No. 14379-07 and throughout the years at issue, Consulting listed as its "business address" 200 Corning Street, Arcadia.

Sundrup Residence

On June 19, 1964, Mr. and Ms. Sundrup purchased a vacant residential lot at 200 Corning Street, Arcadia, and thereafter built a single-family one-floor house with a finished basement and an unfinished attic (original house) on that lot at a cost of $13,000. They moved into that house and have lived there continuously until at least the time of trial in these cases.

---

[6]We shall sometimes refer to Mr. Sundrup and Ms. Sundrup as Mr. and Ms. Sundrup or the Sundrups.

On July 2, 1986, Mr. and Ms. Sundrup purchased a strip of land adjacent to 200 Corning Street, Arcadia, in order to build an addition to the original house. In 1988, they built that addition, which included a two-car garage that is attached to the original house (Sundrup two-car garage) and a small enclosed area on the main floor between that garage and the original house that was approximately 120 square feet (Sundrup enclosed area).[7]

The Sundrup residence, which is in a residential neighborhood consisting of single-family houses, has approximately 1,028 square feet of space on the main floor and approximately 937 square feet of space in the basement. The main floor of the Sundrup residence has three bedrooms, a living room, a kitchen with an eat-in dining area, two full bathrooms, a utility room, and the Sundrup enclosed area. The basement of the Sundrup residence has a family room, a utility room, a full bathroom, and a safe measuring approximately four cubic feet. There is an unfinished attic in the Sundrup residence where certain business documents and Christmas ornaments are stored. In addition to the Sundrup two-car garage that is attached to the original house, there is a one-car garage that is not attached to the original house.

---

[7]We shall refer to the lot that petitioners purchased in 1964, the original house that they built on that lot, the lot that they purchased in 1986, and the addition to the original house that they built on that lot as the Sundrup residence.

The Office of the Carroll County Assessor appraised the Sundrup residence as of January 1, 2008, at $104,800.

Trucking Business

Starting in 1967, Mr. Sundrup, along with his spouse Ms. Sundrup, began operating a trucking business that, inter alia, transported agricultural freight such as cattle, feedstock, fuel, and liquid fertilizers. From 1967 until February 16, 2000, Mr. Sundrup operated that trucking business as a sole proprietorship under the name Ron Sundrup Transfer. Mr. and Ms. Sundrup used certain equipment in operating Ron Sundrup Transfer, including three Kenworth tractor-trailers (tractor-trailers), four corn hoppers, a polar truck tank, certain shop tools, certain shop equipment, and a lawnmower. Although Mr. Sundrup was the principal driver for Ron Sundrup Transfer, that business also used certain other drivers.

The Sundrups conducted the office operations of Ron Sundrup Transfer, which Ms. Sundrup managed, at 200 Corning Street, Arcadia.[8] As part of Ms. Sundrup's managing the office operations of Ron Sundrup Transfer, she answered the telephone,

---

[8]After the Sundrups built the addition to the original house in 1988, they used a portion (Sundrup residence office space) of the Sundrup enclosed area (i.e., the small enclosed area between the Sundrup two-car garage and the original house that was approximately 120 square feet), as well as a desk which was in the original house and on which were a computer and a facsimile/copier machine, to conduct the office operations of Ron Sundrup Transfer.

scheduled pickups, monitored deliveries, and coordinated jobs among its drivers.

Division Street

On August 2, 1996, Mr. and Ms. Sundrup purchased a two-acre parcel of land (Division Street property) at 1000-18 Division Street, Arcadia, from Rita Sundrup, Mr. Sundrup's mother. The Division Street property has two houses on it. (Petitioners, and we shall, refer to those houses as the North House and the South House.)

After Rita Sundrup sold the Division Street property to the Sundrups until at least the time of the trial in these cases, she continued to live in the North House, where she had lived her entire life, but she did not pay any rent to the Sundrups for the use of that house. Nor did Rita Sundrup pay rent to the Sundrups for the use of a garage on the Division Street property.

On a date not disclosed by the record before the years at issue, Mr. and Ms. Sundrup remodeled the South House, and Rick Sundrup, an adult son of Mr. and Ms. Sundrup, moved into that house with his family. From the time Rick Sundrup and his family moved into the South House until at least the time of trial in these cases, they did not pay any rent to the Sundrups for the use of that house.

At all relevant times, in addition to the North House and the South House, there were several freestanding structures on

the Division Street property, including (1) a large maintenance shop and storage building, (2) a large storage building, (3) two small storage sheds, and (4) a garage. (We shall refer to the freestanding structures described in (1) through (3) as the Division Street maintenance and storage structures.) Mr. and Ms. Sundrup used the Division Street maintenance and storage structures in operating Ron Sundrup Transfer.

Vehicles and Condominiums

In addition to the Sundrup residence and the Division Street property that the Sundrups owned during the times indicated above, Mr. and Ms. Sundrup owned the following real property in Branson, Missouri: A condominium described as Thousand Hills, The Legacy, Building 2, Unit 5 (Unit 5), and a condominium described as The Grande Legacy, Building E, Unit 6 (Unit 6).[9]

Mr. and Ms. Sundrup traveled to Branson, Missouri, four times in 2002 in order to make certain repairs and improvements to Unit 5 and/or Unit 6.

Mr. and Ms. Sundrup also owned (1) a 1996 Chevrolet pickup truck that they traded on November 26, 1999, for a new 2000 GMC

---

[9]Although the record does not establish when the Sundrups acquired Unit 5 and Unit 6, the record does establish that the Sundrups owned Unit 5 at least as early as Apr. 1, 2001.

pickup truck (2000 GMC truck) and (2) a 1997 Cadillac automobile
(1997 Cadillac automobile).[10]

Transfer

At a time not disclosed by the record before February 16,
2000, Mr. and Ms. Sundrup retained Frank Pechacek (Mr. Pechacek),
an attorney, who, inter alia, advised them regarding the forma-
tion of certain entities (discussed below).[11]

On February 16, 2000, Mr. and Ms. Sundrup, with the assis-
tance of Mr. Pechacek, incorporated Transfer under the laws of
the State of Iowa. During the years at issue, Mr. Sundrup owned
349 shares, Ms. Sundrup owned 350 shares, and Rick Sundrup, their
son, owned 1 share of Transfer's outstanding stock. At all
relevant times, including during the years at issue, Mr. Sundrup
and Ms. Sundrup were the only members of the board of directors
of Transfer. Throughout the years at issue, Mr. Sundrup was the
president, Ms. Sundrup was the vice president, the secretary, and
the treasurer, and Rick Sundrup was the assistant secretary of
Transfer.

-------

[10]The record does not establish when the Sundrups acquired
the 1996 Chevrolet pickup truck and the 1997 Cadillac automobile.

[11]Mr. Pechacek prepared the respective tax returns of peti-
tioners for all of the taxable years at issue and is the lead
attorney representing them in these cases. Before the commence-
ment of the trial in these cases, petitioners waived any poten-
tial conflicts of interest regarding Mr. Pechacek, who was not
called as a witness at that trial.

On the date on which Mr. and Ms. Sundrup incorporated Transfer, Ron Sundrup Transfer ceased operating, and Transfer began operating, a trucking business.  In operating its trucking business, Transfer undertook the same types of business activities that Ron Sundrup Transfer had previously handled.[12]  As was true when the Sundrups operated Ron Sundrup Transfer, the Sundrups conducted the office operations of Transfer, which Ms. Sundrup managed, at 200 Corning Street, Arcadia (i.e., the Sundrup residence).[13]  As was true when Ms. Sundrup managed the office operations of Ron Sundrup Transfer, as part of Ms. Sundrup's managing the office operations of Transfer, she answered the telephone, scheduled pickups, monitored deliveries, and coordinated jobs among its drivers.  During each of its taxable years ended March 31, 2004 through 2006, Ms. Sundrup spent approximately 24 hours each week managing the office operations of Transfer.

During each of its taxable years ended March 31, 2004 through 2006, Rick Sundrup was a full-time driver, and Mr.

---

[12]Around the date on which the Sundrups incorporated Transfer, Mr. Sundrup transferred to Transfer certain assets that he had used in the business operations of Ron Sundrup Transfer.

[13]As was true with respect to the office operations of Ron Sundrup Transfer during the period 1988 to Feb. 16, 2000, after the Sundrups incorporated Transfer, they used the Sundrup residence office space, as well as a desk which was in the original house and on which were a computer and a facsimile/copier machine, to conduct the office operations of Transfer.  See supra note 8.

Sundrup also served as a driver, for Transfer. During each of those years, Mr. Sundrup did work repairing, maintaining, and washing certain vehicles that Transfer used in its trucking business.[14] During each of Transfer's taxable years ended March 31, 2004 and 2005, Kerry Henkenius provided part-time office support for that business and did so in the Sundrup residence office space. During Transfer's taxable year ended March 31, 2006, Erin Sundrup, Rick Sundrup's wife, provided part-time office support for that business and did so in the Sundrup residence office space.

During each of its taxable years indicated, Transfer paid to the following individuals the following amounts of cash compensation:

---

[14]Our findings that during each of Transfer's taxable years at issue Mr. Sundrup served as a driver for Transfer and did certain work on certain vehicles that it used in its business are not intended to suggest or imply that Mr. Sundrup did no other work for Transfer during each of those years.

| Individual | Taxable Year Ended Mar. 31 | Cash Compensation |
|---|---|---|
| Rick Sundrup | 2004 | $44,032.82 |
| | 2005 | 43,197.17 |
| | 2006 | 53,199.74 |
| Kerry Henkenius | 2004 | 9,520.50 |
| | 2005 | 5,123.25 |
| Erin Sundrup | 2006 | 3,428.00 |
| Ms. Sundrup[1] | 2004 | 3,600.00 |

[1]The record does not establish the precise nature of the work that Ms. Sundrup did for Transfer during its taxable year ended Mar. 31, 2004, for which Transfer paid her $3,600 of cash compensation. Our finding that Ms. Sundrup received that cash compensation during that year for certain unexplained work is not intended to suggest or imply that Ms. Sundrup did no other work for Transfer during each of its taxable years at issue.

Except for the $3,600 of cash compensation that Transfer paid to Ms. Sundrup during its taxable year ended March 31, 2004, Transfer paid no cash compensation to Mr. Sundrup or to Ms. Sundrup during any of its taxable years ended March 31, 2004 through 2006.

Certain Payments Made by Transfer
for Medical and Dental Expenses

On April 1, 2000, Transfer executed a document entitled "NONDISCRIMINATORY MEDICAL AND DENTAL REIMBURSEMENT PLAN" (Transfer medical and dental plan). That document stated in pertinent part:

1. Purposes of Plan  The purposes of the Plan are:

    (a)  To encourage employees to continue their association with the Company.

(b)  To attract additional employees.

*        *        *        *        *        *        *

2.  <u>Eligibility</u>.  All employees who have been with the Company [Transfer] for six (6) months, or since the Company was incorporated, whichever is shorter, pro-vided, however, that seasonal employees, employees covered by a collective bargaining agreement, or non-resident alien employees shall not be eligible.

3.  <u>Benefits</u>.  The Company will reimburse all eligible employees for all reasonable medical and dental ex-penses up to the sum of $5,000.00 in any fiscal year (including, but not limited to the cost of any acci-dent, health or medical or dental insurance policy) which the eligible employee and/or members of his immediate family may incur, except such expenses as may be covered and are reimbursable to them from any medi-cal, dental, health and/or accident insurance policy insuring them.

On April 1, 2000, Transfer and Mr. Sundrup executed a document entitled "AGREEMENT", "NONDISCRIMINATORY MEDICAL AND DENTAL REIMBURSEMENT PLAN" (Mr. Sundrup's medical and dental agreement with Transfer), and Transfer and Ms. Sundrup executed a document with the same title (Ms. Sundrup's medical and dental agreement with Transfer).[15]  Mr. Sundrup signed Mr. Sundrup's medical and dental agreement with Transfer both in his individual capacity and as president of Transfer.  Ms. Sundrup signed Ms. Sundrup's medical and dental agreement with Transfer in her

---

[15]Although the record establishes that Rick Sundrup, the Sundrups' son, was entitled to benefits under the Transfer medical and dental plan, the record does not contain any document that purports to be an agreement between him and Transfer with respect to that plan.

individual capacity, and Mr. Sundrup signed that document as president of Transfer.

Except as noted below, Mr. Sundrup's medical and dental agreement with Transfer and Ms. Sundrup's medical and dental agreement with Transfer contained essentially the same provisions. They stated in pertinent part:

> This will serve to confirm the understanding and agreement between you [Mr. Sundrup in the case of Mr. Sundrup's purported medical and dental agreement with Transfer and Ms. Sundrup in the case of Ms. Sundrup's purported medical and dental agreement with Transfer] and the undersigned (hereinafter "Corporation") [Transfer].
>
> 1. The Corporation has adopted a Nondiscriminatory Medical and Dental Reimbursement Plan. Pursuant to such Plan and for so long as you are employed by the Corporation, the Corporation agrees to reimburse you for all reasonable medical and dental expenses up to the sum of $5,000.00 in any fiscal year (including but not limited to the cost of any accident, health, medical or dental insurance policy) which you and/or members of your immediate family may incur, except such expenses which are covered and are reimbursable to you from any medical, dental, health and/or accident insurance policy insuring you and/or members of your immediate family.

During Transfer's taxable year ended March 31, 2004,[16] Transfer paid directly, or reimbursed Mr. Sundrup, Ms. Sundrup, and/or Rick Sundrup, a total of $12,258.65 for certain of their respective medical and dental expenses. (We shall refer to the

---

[16]The record does not establish that Transfer paid any medical or dental expenses of Mr. Sundrup, Ms. Sundrup, or Rick Sundrup during each of its taxable years ended Mar. 31, 2005 and 2006.

portion of the medical and dental expenses that Transfer paid directly, or reimbursed Mr. Sundrup and/or Ms. Sundrup, for certain of their respective medical and dental expenses as Transfer's payments of the Sundrups' medical and dental expenses.)[17]

Leasing

On February 16, 2000, the same day on which Mr. and Ms. Sundrup incorporated Transfer, they, with the assistance of Mr. Pechacek, organized Sundrup Leasing, L.L.C. (Leasing), as a limited liability company under the laws of the State of Iowa and adopted an operating agreement for it. The articles of organization of Leasing showed 200 Corning Street, Arcadia (i.e., the Sundrup residence), as its principal office. At all relevant times, Mr. Sundrup and Ms. Sundrup were the only members, and the only managers, of Leasing.

Sometime between the formation of Leasing on February 16, 2000, and March 1, 2000, Mr. Sundrup transferred to Leasing

---

[17]The parties stipulated the nature and the amounts of the various expenses of Mr. Sundrup and/or Ms. Sundrup that Transfer or Consulting, as the case may be, paid during each of those companies' respective taxable years at issue. In certain instances, the description that the parties stipulated regarding a particular expense did not correspond to the nature of the expense that the parties stipulated. For example, the parties stipulated that a $319.62 expense was for "Life insurance" but the parties also stipulated that that expense was a medical expense. The record does not explain the apparent inconsistencies in the parties' stipulations. We need not resolve those apparent inconsistencies in order to decide the issues presented.

certain of the assets that he had been using in the trucking business of Ron Sundrup Transfer, including the three tractor-trailers, four corn hoppers, and a Polar truck tank.

On March 1, 2000, Leasing entered into an agreement with Transfer under which Leasing agreed to lease the three tractor-trailers to Transfer for use in Transfer's trucking business. That agreement provided that Transfer was to pay Leasing $73,672 each year for the use of those trucks. Transfer paid Leasing only $24,000 during each of its taxable years ended March 31, 2004 through 2006, for the use of the three tractor-trailers.

On April 1, 2000, Mr. and Ms. Sundrup transferred the Division Street property to Leasing by quitclaim deed.[18] On the same day, Transfer entered into an agreement with Leasing under which Leasing agreed to lease the Division Street property to Transfer for use in Transfer's trucking business. That agreement provided that Transfer was to pay Leasing $24,000 each year for the use of the Division Street property. Transfer paid Leasing only $20,000 during each of its taxable years ended March 31, 2004 and 2005, for the use of the Division Street property. Transfer paid Leasing $24,000 during its taxable year ended March 31, 2006, for the use of that property.

---

[18]On Jan. 9, 2001, the quitclaim deed transferring the Division Street property to Leasing was filed with the Office of the Recorder of Deeds of Carroll County (Carroll County re-corder's office).

On April 1, 2001, Mr. and Ms. Sundrup transferred Unit 5 to Leasing by quitclaim deed. On the next day, Mr. and Ms. Sundrup, acting in their individual capacities, executed a management agreement (Unit 5 management agreement) with a company called Thousand Hills Management Co., Inc., (THMC). Under that agreement, THMC agreed to rent that unit nightly to third parties and to make emergency repairs to that unit when necessary. Although Mr. and Ms. Sundrup had transferred Unit 5 to Leasing by quitclaim deed, they were described in the Unit 5 management agreement as "Owner" of Unit 5, and Mr. and Ms. Sundrup signed that document as "Owner" of that unit.

On a date not disclosed by the record, Mr. and Ms. Sundrup transferred Unit 6 to Leasing.[19] On August 25, 2001, Leasing executed a management agreement with THMC. Under that agreement, THMC agreed to rent that unit nightly to third parties and to make emergency repairs to that unit when necessary. Although Mr. and Ms. Sundrup signed that agreement, they did not indicate whether they had signed it as managers of Leasing or in their individual capacities.

Sometime in 2004 before April 6 Leasing purchased a condo-minium in Branson, Missouri, described as Tuscany Place, Building 1, Unit 4 (Unit 4). On April 6, 2004, Leasing executed a manage-

---

[19]The record does not establish how the Sundrups' transfer of Unit 6 to Leasing was effected.

ment agreement (Unit 4 management agreement) with THMC.[20] Under that agreement, THMC agreed to rent that unit nightly to third parties and to make emergency repairs to that unit when necessary. Leasing was described in the Unit 4 management agreement as "Owner" of Unit 4. Although Mr. Sundrup signed that agreement, he did not indicate whether he had signed it as a manager of Leasing or in his individual capacity.

As was true at least in 2002, during the years at issue the Sundrups traveled to Branson, Missouri, in order to make certain repairs and improvements to Unit 5 and/or Unit 6. In addition, during the years at issue after the date on which Leasing had purchased Unit 4, they traveled to Branson, Missouri, in order to make certain repairs and improvements to Unit 4. They traveled to Branson, Missouri, in order to make certain repairs and improvements (1) to Unit 5 and/or Unit 6 four times in 2003 and (2) to Unit 4, Unit 5, and/or Unit 6 five times in 2004, four times in 2005, and at least one time in 2006.[21]

Consulting

On April 24, 2000, Mr. and Ms. Sundrup, with the assistance of Mr. Pechacek, incorporated Consulting under the laws of the

---

[20]Although the Unit 4 management agreement was executed on Apr. 6, 2004, it was dated Mar. 18, 2004.

[21]The record does not contain evidence regarding the trips, if any, that the Sundrups made to Branson, Missouri, after Feb. 20, 2006.

State of Iowa.  At all relevant times, including during the years at issue, Mr. Sundrup and Ms. Sundrup each owned 50 percent of the outstanding stock of Consulting.  At those times, Mr. and Ms. Sundrup were the only members of the board of directors of Consulting (Consulting board).  During the years at issue, Mr. Sundrup was the president, and Ms. Sundrup was the vice president, the secretary, and the treasurer, of Consulting.  At all relevant times, Consulting did not pay Mr. and Ms. Sundrup any cash dividends.

The Purported Management Agreements

On May 1, 2000, Consulting and Transfer executed a document entitled "MANAGEMENT CONSULTING AGREEMENT" (purported Transfer management agreement).[22]  Mr. Sundrup executed that document as president of Consulting and as president of Transfer.

On January 1, 2003, Leasing and Consulting executed a document entitled "MANAGEMENT CONSULTING AGREEMENT" (purported

---

[22]The parties stipulated that the purported Transfer management agreement was executed on Apr. 1, 2000, which was more than three weeks before Mr. and Ms. Sundrup incorporated Consulting on Apr. 24, 2000.  That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).  The record establishes, and we have found, that the purported Transfer management agreement was not executed until May 1, 2000.

Leasing management agreement).[23]  Mr. Sundrup executed that document as a manager of Leasing and as president of Consulting.

Except as noted below, the purported Transfer management agreement and the purported Leasing management agreement contained essentially the same provisions.[24]  They stated in pertinent part:

> **1.  Management Services**.  Corporation [in the case of Transfer and LLC in the case of Leasing] hereby contracts with Consulting * * * to perform management and consulting services in accordance with the terms and conditions set forth in this Agreement.
>
> Consulting * * * will consult with the officers and employees of Corporation [in the case of Transfer and LLC in the case of Leasing] concerning matters related to the management and operation of Corporation [in the case of Transfer and LLC in the case of Leasing], its financial policies, and generally any matter arising out of the business affairs of Corporation [in the case of Transfer and LLC in the case of Leasing]. The management services shall include, but not be limited to, advice and services regarding marketing, accounting, technical and computer support, and personnel matters.  The management services regarding personnel matters shall include advice regarding employment control, supervision, hiring and discharge of employees and independent contractors hired by Corporation [in the case of Transfer and LLC in the case of Leasing].

---

[23]The parties stipulated that the purported Leasing management agreement was executed on Apr. 1, 2000.  That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it.  See Cal-Maine Foods, Inc. v. Commissioner, supra at 195.  The record establishes, and we have found, that the purported Leasing management agreement was not executed until Jan. 1, 2003.

[24]Except for the purported Transfer management agreement with Transfer and the purported Leasing management agreement with Leasing, Consulting did not enter into any other purported management agreements.

Consulting * * * may provide advice with respect to employee benefits and enter into negotiations regarding same on behalf of Corporation [in the case of Transfer and LLC in the case of Leasing]. Consulting * * * will also provide advice with respect to the purchase and/or lease of equipment and supplies relating to Corporation's [in the case of Transfer and LLC's in the case of Leasing] business.

*       *       *       *       *       *       *

**3.** **Payment to Consulting Company.** Corporation [in the case of Transfer and LLC in the case of Leasing] shall pay Consulting * * * the sum of $3,000.00 [in the case of Transfer and $2,500.00 in the case of Leasing] per month on or before the first day of each month. Corporation [in the case of Transfer and LLC in the case of Leasing] shall not be required to pay any other fee or benefit to Consulting * * * for services rendered. Consulting * * * may submit reasonable out-of-pocket expenses from time to time to Corporation [in the case of Transfer and LLC in the case of Leasing] which will be reimbursed only upon Corporation [in the case of Transfer and LLC in the case of Leasing] approval.

**4.** **Duties of Consulting Company.** Consulting * * * shall furnish consulting and management services and render advice to Corporation [in the case of Transfer and LLC in the case of Leasing] at all times reasonably requested by Corporation [in the case of Transfer and LLC in the case of Leasing], subject, however, to the following conditions:

*       *       *       *       *       *       *

b.     Consulting * * * shall not be required to devote full time and attention to providing services to Corporation [in the case of Transfer and LLC in the case of Leasing]. The services and hours Consulting * * * is to work on any given day will be within Consulting['s] * * * control; provided, however, that Consulting * * * shall be adequately staffed to effectively service the Corporation's [in the case of Transfer and

LLC's in the case of Leasing] needs at
all times.

c.  Consulting * * * may offer its services
to anyone, in addition to Corporation
[in the case of Transfer and LLC in the
case of Leasing], for so long as the
terms and conditions of this Agreement
are adhered to by Consulting * * *.

*       *       *       *       *       *       *

f.  Consulting * * * provides its services
to the general public and this Agreement
is non-exclusive.

*       *       *       *       *       *       *

**8. Amendments**. No amendment, modification, or
termination of, or addition to, this Agreement shall be
valid unless and until executed in writing by the
parties to this Agreement.

In drafting the purported Transfer management agreement and
the purported Leasing management agreement, including in arriving
at the $3,000 amount stated in section 3 (quoted above) of the
purported Transfer management agreement and the $2,500 amount
stated in section 3 (quoted above) of the purported Leasing
management agreement, Mr. Sundrup did not consult an accountant,
a business adviser, or any other person except Mr. Pechacek.[25]

During none of Transfer's taxable years at issue did Trans-
fer pay Consulting $3,000 each month on or before the first day
of the month, as stated in the purported Transfer management
agreement. Instead, on the dates indicated, Transfer paid to

---

[25]The record does not establish what Mr. Pechacek told Mr.
Sundrup when he consulted him.

Consulting the following amounts during each of Transfer's taxable years ended (TYE) March 31, 2004 through 2006:

TYE Mar. 31, 2004

| Date | Amount |
|------|--------|
| Apr. 2, 2003 | $1,750 |
| Apr. 16, 2003 | 1,750 |
| May 7, 2003 | 1,750 |
| May 21, 2003 | 1,750 |
| June 4, 2003 | 1,750 |
| June 19, 2003 | 1,750 |
| July 2, 2003 | 1,750 |
| July 23, 2003 | 1,750 |
| Aug. 8, 2003 | 1,750 |
| Aug. 20, 2003 | 1,750 |
| Sept. 3, 2003 | 1,750 |
| Sept. 24, 2003 | 1,750 |
| Oct. 8, 2003 | 1,750 |
| Oct. 29, 2003 | 1,750 |
| Nov. 5, 2003 | 1,750 |
| Nov. 19, 2003 | 1,750 |
| Dec. 3, 2003 | 1,750 |
| Dec. 10, 2003 | 1,750 |
| Dec. 23, 2003 | 1,750 |
| Jan. 7, 2004 | 1,750 |
| Jan. 21, 2004 | 1,750 |
| Feb. 4, 2004 | 1,750 |
| Feb. 13, 2004 | 3,500 |
| Feb. 26, 2004 | 1,750 |
| Mar. 31, 2004 | 1,750 |
| Total | 45,500 |

TYE Mar. 31, 2005

| Date | Amount |
|------|--------|
| Apr. 21, 2004 | $1,750 |
| May 4, 2004 | 1,750 |
| May 19, 2004 | 1,750 |
| June 9, 2004 | 1,750 |
| June 30, 2004 | 1,750 |
| July 13, 2004 | 1,750 |
| July 28, 2004 | 1,750 |
| Aug. 10, 2004 | 1,750 |
| Aug. 25, 2004 | 1,750 |
| Sept. 5, 2004 | 1,750 |
| Sept. 22, 2004 | 1,750 |
| Oct. 13, 2004 | 1,750 |
| Nov. 3, 2004 | 1,750 |
| Nov. 23, 2004 | 1,750 |
| Dec. 7, 2004 | 1,750 |
| Dec. 29, 2004 | 1,750 |
| Jan. 11, 2005 | 1,750 |
| Jan. 26, 2005 | 1,750 |
| Feb. 10, 2005 | 1,750 |
| Feb. 23, 2005 | 1,750 |
| Mar. 9, 2005 | 1,750 |
| Mar. 23, 2005 | 1,750 |
| Total | 38,500 |

TYE Mar. 31, 2006

| Date | Amount |
|------|--------|
| Apr. 6, 2005 | $1,750 |
| Apr. 20, 2005 | 1,750 |
| May 11, 2005 | 1,750 |
| May 25, 2005 | 1,750 |
| June 8, 2005 | 1,750 |
| June 22, 2005 | 1,750 |
| July 5, 2005 | 1,750 |
| July 20, 2005 | 1,750 |
| Aug. 10, 2005 | 1,750 |
| Aug. 23, 2005 | 1,750 |
| Aug. 31, 2005 | 1,750 |
| Sept. 21, 2005 | 1,750 |
| Oct. 5, 2005 | 1,750 |
| Oct. 19, 2005 | 1,750 |
| Nov. 3, 2005 | 1,750 |
| Nov. 23, 2005 | 1,750 |
| Dec. 13, 2005 | 1,750 |
| Dec. 21, 2005 | 1,750 |
| Jan. 10, 2006 | 1,750 |
| Jan. 26, 2006 | 1,750 |
| Feb. 9, 2006 | 1,750 |
| Feb. 21, 2006 | 1,750 |
| Mar. 8, 2006 | 1,750 |
| Mar. 21, 2006 | 1,750 |
| Total | 42,000 |

(We shall refer to any, some, or all of the above-listed payments as Transfer's payments to Consulting.)

During none of Leasing's taxable years at issue did Leasing pay Consulting $2,500 each month on or before the first day of the month, as stated in the purported Leasing management agreement. Instead of making any payments to Consulting during Leasing's taxable year 2003, Leasing gave Consulting a promissory

note dated December 30, 2003, in the principal amount of $30,000 (Leasing's promissory note dated December 30, 2003).  On the dates indicated, Leasing paid to Consulting the following amounts during each of Leasing's taxable years 2004 and 2005:

Taxable Year 2004

| Date | Amount |
|------|--------|
| Mar. 10, 2004 | $18,000 |
| Apr. 12, 2004 | 12,000 |
| Total | 30,000 |

Taxable Year 2005

| Date | Amount |
|------|--------|
| Mar. 8, 2005 | $1,000 |
| Apr. 5, 2005 | 1,000 |
| May 3, 2005 | 1,000 |
| May 17, 2005 | 4,000 |
| Oct. 14, 2005 | 1,000 |
| Nov. 3, 2005 | 1,000 |
| Dec. 1, 2005 | 1,000 |
| Total | 10,000 |

(We shall refer to any, some, or all of the above-listed payments as Leasing's payments to Consulting.)

The Purported Employment Agreements

On April 1, 2000, more than three weeks before Consulting was incorporated on April 24, 2000,[26] and one month before the purported Transfer management agreement was executed on May 1, 2000, Consulting and Mr. Sundrup executed a document entitled

---

[26]Although the parties stipulated that the date on which the Sundrups executed their respective purported employment agreements with Consulting was Apr. 1, 2000, the record does not explain how they could have executed those purported agreements on a date before Consulting was incorporated.

"EMPLOYMENT AGREEMENT" (Mr. Sundrup's purported employment agreement), and Consulting and Ms. Sundrup executed a document entitled "EMPLOYMENT AGREEMENT" (Ms. Sundrup's purported employment agreement).[27]  Mr. Sundrup signed Mr. Sundrup's purported employment agreement both as "employee" and as president of Consulting, and Ms. Sundrup signed Ms. Sundrup's purported employment agreement as "employee", and Mr. Sundrup signed that document as president of Consulting.

Except as noted below, Mr. Sundrup's purported employment agreement and Ms. Sundrup's purported employment agreement contained essentially the same provisions.  They stated in pertinent part:

> An Agreement made between Ronald B. Sundrup [in the case of Mr. Sundrup's purported employment agreement and Ms. Sundrup in the case of Ms. Sundrup's purported employment agreement] of Arcadia, Iowa, herein referred to as Employee and Sundrup Consulting, Inc., whose principal place of business is located at 200 Corning St., Arcadia, Iowa [Sundrup residence], herein referred to as Employer.

> *      *      *      *      *      *      *

> SECTION 1.

> EMPLOYMENT

> Employer hereby employs, engages, and hires Employee as an operational supervisor and monitor of a portion of Employer's business, and Employee hereby

---

[27]Except for Mr. Sundrup's purported employment agreement and Ms. Sundrup's purported employment agreement, at no time was there a purported employment agreement between Consulting and any other individual.

accepts and agrees to such hiring, engagement and employment, subject to the general supervision and pursuant to the orders, advice and direction of Employer.

Because of certain necessities required for the proper performance of the duties which the Employee must perform for the Employer under this Agreement and because of the benefits and conveniences accruing to the Employer by having the Employee residing on business premises of the Employer, the Employee shall be required to live in the housing furnished by the Employer on the business premises [Sundrup residence] of the Employer. * * *

    *     *     *     *     *     *     *

## SECTION 3.

### TERM OF EMPLOYMENT

The term of this Agreement shall be a period of one year, commencing _____, 2000, and terminating _____, 2001, subject, however, to prior termination as herein provided.  At the expiration date of _____, 2001, this Agreement shall be considered renewed for regular periods of one year provided neither party submits a notice of termination.

    *     *     *     *     *     *     *

## SECTION 6.

### SPECIFIC DESCRIPTION OF CERTAIN DUTIES

While at all times, the Employee will be subject to such additional duties and services as may be required by the Employer, the following are a list of certain specific duties and responsibilities Employee shall have in performing services for the Employer. The Employee in performing these services shall be on call twenty-four hours a day except for reasonable vacations as the Employer may allow.  Duties and responsibilities are to be performed at the location as directed by the Employer above.

(1) To constantly be present in the area of responsibility to deter and guard against vandalism and theft of equipment, tools, buildings and other property of the Employer.

(2) To maintain watch over the property of the Employer so as to discover and report any damage to any of the Employer's property from wind, fire, freezing, or other catastrophes and to take any other action if possible to minimize said losses.

(3) To be present on the premises so as to immediately detect and report any interruption of electrical service to the facilities of the Employer so as to minimize the possibility of any losses.

(4) To monitor the performance and activities of other Employees of the Employer working on the premises and report to the Employer concerning their activities.

(5) To provide assistance to other Employees of the Employer in case of a breakdown or emergency while operating on the property of the Employer.

(6) To be present to alert other designated Employees of shipments of materials being received by Employer.

At no time during the taxable years at issue did (1) Mr. Sundrup and Consulting determine the respective dates on which Mr. Sundrup's purported employment agreement commenced and terminated as contemplated under section 3 of that agreement and (2) Ms. Sundrup and Consulting determine the respective dates on which Ms. Sundrup's purported employment agreement commenced and terminated as contemplated under section 3 of that agreement.

Mr. Sundrup's purported employment agreement and Ms. Sundrup's purported employment agreement contained a section entitled "COMPENSATION OF EMPLOYEE". That section in each of those agreements stated:

SECTION 4.

COMPENSATION OF EMPLOYEE

> Employer [Consulting] shall pay Employee [Mr. Sundrup in the case of Mr. Sundrup's purported employment agreement and Ms. Sundrup in the case of Ms. Sundrup's purported employment agreement] and Employee shall accept from Employer, in full payment for Employee's services hereunder, minimum compensation at the rate of _____ Dollars ($_____) per _____, payable _____. Notwithstanding any language to the contrary, Employer, in its sole discretion, may pay Employee additional compensation from time to time.

At no time during the taxable years at issue did (1) Mr. Sundrup and Consulting determine a rate of compensation to be paid to Mr. Sundrup as contemplated under section 4 of Mr. Sundrup's purported employment agreement and (2) Ms. Sundrup and Consulting determine a rate of compensation to be paid to Ms. Sundrup as contemplated under section 4 of Ms. Sundrup's purported employment agreement. At all relevant times, Consulting did not pay any wages or salary to Mr. Sundrup or Ms. Sundrup. At no time before the trial in these cases did Consulting file (1) Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and (2) Form 941, Employer's Quarterly Federal Tax Return. Nor did Consulting issue at any time before that trial

(1) Form W-2, Wage and Tax Statement, or (2) Form 1099-MISC, Miscellaneous Income.

Consulting's Board of Directors

On May 1, 2000, Consulting held a meeting (May 1, 2000 board meeting) of the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, that the Consulting board (1) elected for a one-year term Mr. Sundrup as president of Consulting and Ms. Sundrup as vice president, secretary, and treasurer of Consulting, (2) adopted the bylaws of Consulting,[28] (3) designated Carroll County State Bank as Consulting's depository institution, (4) required that Consulting's officers and directors use their best efforts to operate Consulting in such a manner that the stock of Consulting would qualify as stock under section 1244, (5) accepted Mr. Sundrup's offer to purchase stock of Consulting and resolved to issue to him a certificate representing the number of shares that he purchased, (6) made an election under section 248 with respect to Consulting's organizational expenses, (7) authorized Mr. Sundrup to pay any expenses resulting from the organization of Consulting, and (8) adopted a "Nondiscriminatory Medical and Dental Reimbursement Plan".

_____

[28]At no time before the trial in these cases were Consulting's bylaws amended.

The minutes of the May 1, 2000 board meeting did not reflect that the Consulting board discussed at that meeting (1) the purported Transfer management agreement that Consulting and Transfer had executed on the date of that meeting and (2) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement that Consulting and Mr. Sundrup or Ms. Sundrup, as the case may be, executed on April 1, 2000.[29] Nor did those minutes reflect that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Transfer management agreement stated Consulting was to provide to Transfer and (2) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.

On March 20, 2001, Consulting held a joint meeting (March 20, 2001 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the

---

[29]Mr. Sundrup's purported employment agreement and Ms. Sundrup's purported employment agreement were executed on Apr. 1, 2000, more than three weeks before Consulting was incorporated. The minutes of the May 1, 2000 board meeting do not reflect that Consulting ratified those purported employment agreements at that meeting.

Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting and Ms. Sundrup as vice president, secretary, and treasurer of Consulting. Those minutes did not state that the Consulting board discussed at the March 20, 2001 joint meeting (1) the purported Transfer management agreement and (2) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Transfer management agreement stated Consulting was to provide to Transfer and (2) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.

On March 1, 2002, Consulting held a joint meeting (March 1, 2002 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting and Ms.

Sundrup as vice president, secretary, and treasurer of Consulting. Those minutes did not state that the Consulting board discussed at the March 1, 2002 joint meeting (1) the purported Transfer management agreement and (2) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Transfer management agreement stated Consulting was to provide to Transfer and (2) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.

On March 1, 2003, Consulting held a joint meeting (March 1, 2003 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting and Ms. Sundrup as vice president, secretary, and treasurer of Consulting. Those minutes did not state that the Consulting board discussed at the March 1, 2003 joint meeting (1) the purported

Leasing management agreement that Consulting had executed on January 1, 2003, two months before the March 1, 2003 joint meeting, (2) the purported Transfer management agreement, and (3) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Leasing management agreement stated Consulting was to provide to Leasing, (2) that the purported Transfer management agreement stated Consulting was to provide to Transfer, and (3) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.

On March 2, 2004, Consulting held a joint meeting (March 2, 2004 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting, Ms. Sundrup as vice president, secretary, and treasurer of Consulting, and Rick Sundrup as assistant secretary of Consulting. Those minutes

did not state that the Consulting board discussed at the March 2, 2004 joint meeting (1) the purported Leasing management agreement, (2) the purported Transfer management agreement, and (3) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement.  Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Leasing management agreement stated Consulting was to provide to Leasing, (2) that the purported Transfer management agreement stated Consulting was to provide to Transfer, and (3) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.  The minutes of the March 2, 2004 joint meeting did not state that the Consulting board discussed at that meeting that as of the date of that meeting Leasing had failed to pay to Consulting during Consulting's taxable year that started on April 1, 2003, the $2,500 monthly amount that section 3 of the purported Leasing management agreement stated Leasing was to pay to Consulting on or before the first day of each month.[30]  Nor did those minutes state that the Consulting board discussed at

---

[30]As of the March 2, 2004 joint meeting, Leasing had not paid anything to Consulting during Consulting's taxable year that began on Apr. 1, 2003.  We have found above that Leasing provided to Consulting Leasing's promissory note dated December 30, 2003.

the March 2, 2004 joint meeting that as of the date of that meeting Transfer had failed to pay to Consulting during Consulting's taxable year that started on April 1, 2003, the $3,000 monthly amount that section 3 of the purported Transfer management agreement stated Transfer was to pay to Consulting on or before the first day of each month.[31]

On March 7, 2005, Consulting held a joint meeting (March 7, 2005 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting, Ms. Sundrup as vice president, secretary, and treasurer of Consulting, and Rick Sundrup as assistant secretary of Consulting. Those minutes did not state that the Consulting board discussed at the March 7, 2005 joint meeting (1) the purported Leasing management agreement, (2) the purported Transfer management agreement, and (3)(a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that

---

[31]We have found above the respective amounts and the respective dates on which Transfer made Transfer's payments to Consulting.

meeting the nature or the extent of the services (1) that the purported Leasing management agreement stated Consulting was to provide to Leasing, (2) that the purported Transfer management agreement stated Consulting was to provide to Transfer, and (3)(a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting. The minutes of the March 7, 2005 joint meeting did not state that the Consulting board discussed at that meeting that as of the date of that meeting Leasing had failed to pay to Consulting at any time since the March 2, 2004 joint meeting, the $2,500 monthly amount that section 3 of the purported Leasing management agreement stated Leasing was to pay to Consulting on or before the first day of each month.[32] Nor did those minutes state that the Consulting board discussed at the March 7, 2005 joint meeting that as of the date of that meeting Transfer had failed to pay to Consulting at any time since the March 2, 2004 joint meeting the $3,000 monthly amount that section 3 of the purported Transfer management agreement stated

---

[32]We have found above the respective amounts and the respective dates on which Leasing made Leasing's payments to Consulting.

Transfer was to pay to Consulting on or before the first day of each month.[33]

On July 6, 2006, Consulting held a joint meeting (July 6, 2006 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board (i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that the Consulting board elected for a one-year term Mr. Sundrup as president of Consulting, Ms. Sundrup as vice president, secretary, and treasurer of Consulting, and Rick Sundrup as assistant secretary of Consulting. Those minutes did not state that the Consulting board discussed at the July 6, 2006 joint meeting (1) the purported Leasing management agreement, (2) the purported Transfer management agreement, and (3) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Leasing management agreement stated Consulting was to provide to Leasing, (2) that the purported Transfer management agreement stated Consulting was to provide to Transfer, and

_____

[33]We have found above the respective amounts and the respective dates on which Transfer made Transfer's payments to Consulting.

(3) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting. The minutes of the July 6, 2006 joint meeting did not state that the Consulting board discussed at that meeting that as of the date of that meeting Leasing had failed to pay to Consulting at any time since the March 7, 2005 joint meeting the $2,500 monthly amount that section 3 of the purported Leasing management agreement stated Leasing was to pay to Consulting on or before the first day of each month.[34] Nor did those minutes state that the Consulting board discussed at the July 6, 2006 joint meeting that as of the date of that meeting Transfer had failed to pay to Consulting at any time since the March 7, 2005 joint meeting the $3,000 monthly amount that section 3 of the purported Transfer management agreement stated Transfer was to pay to Consulting on or before the first day of each month.[35]

On January 15, 2007, Consulting held a joint meeting (January 15, 2007 joint meeting) of the stockholders of Consulting (i.e., Mr. Sundrup and Ms. Sundrup) and the Consulting board

---

[34]We have found above the respective amounts and the respective dates on which Leasing made Leasing's payments to Consulting.

[35]We have found above the respective amounts and the respective dates on which Transfer made Transfer's payments to Consulting.

(i.e., Mr. Sundrup and Ms. Sundrup). The minutes of that meeting stated, inter alia, (1) that the stockholders of Consulting elected for a one-year term Mr. Sundrup and Ms. Sundrup as members of the Consulting board and (2) that Consulting's board elected for a one-year term Mr. Sundrup as president of Consulting, Ms. Sundrup as vice president, secretary, and treasurer of Consulting, and Rick Sundrup as assistant secretary of Consulting. Those minutes did not state that the Consulting board discussed at the January 15, 2007 joint meeting (1) the purported Leasing management agreement, (2) the purported Transfer management agreement, and (3) (a) Mr. Sundrup's purported employment agreement and (b) Ms. Sundrup's purported employment agreement. Nor did the minutes of that meeting state that the Consulting board discussed at that meeting the nature or the extent of the services (1) that the purported Leasing management agreement stated Consulting was to provide to Leasing, (2) that the purported Transfer management agreement stated Consulting was to provide to Transfer, and (3) (a) that Mr. Sundrup's purported employment agreement stated Mr. Sundrup was to provide to Consulting and (b) that Ms. Sundrup's purported employment agreement stated Ms. Sundrup was to provide to Consulting.

Certain Payments Made by Consulting

During the years at issue, Consulting paid directly, or reimbursed Mr. Sundrup and/or Ms. Sundrup, for various expenses.[36]

Certain Payments Made by Consulting for
Expenses Relating to the Sundrup Residence

On May 1, 2000, one week after incorporating Consulting on April 24, 2000, Consulting and the Sundrups executed a document entitled "REAL ESTATE CONTRACT-INSTALLMENTS" (real estate installment document), which was filed with the Carroll County recorder's office. That document stated in pertinent part:

> IT IS AGREED this 1st day of May, 2000, by and between Ronald B. Sundrup and Helen J. Sundrup, husband and wife of the County of Carroll, State of Iowa, Sellers; and Sundrup Consulting, Inc. of the County of Carroll, State of Iowa, Buyers;
> That the Sellers, as in this contract provided, agree to sell to the Buyers, and the Buyers in consideration of the premises, hereby agree with the Sellers to purchase the following described real estate situated in the County of Carroll, State of Iowa,[37] to-wit:
>
> All of Lot Twelve (12) and the East Ten Feet (E 10') of Lot Eleven (11), Block Twenty Four (24), Original Plat, Arcadia, Carroll County, Iowa
>
> and

---

[36]Although Consulting not only paid directly, but also reimbursed Mr. Sundrup and/or Ms. Sundrup, for their various expenses, for convenience we shall state that Consulting paid those expenses.

[37]The real estate described in the real estate installment document is the Sundrup residence.

The East 15 feet of the West 40 feet of Lot 11, Block 24, Town of Arcadia, Carroll County, Iowa

* * * upon the terms and conditions following:

   **1.   TOTAL PURCHASE PRICE.**   The Buyers agree to pay for said property the total of $190,000.00 due and payable * * * as follows:

   *         *         *         *         *         *         *

Buyer shall pay the sum of $19,562.93 per year, commencing with the first payment due on May 1, 2001 and the sum of $19,562.93 on May 1 of each and every year thereafter until all principal and interest is paid in full.   Interest shall accrue at the rate of 6% per annum. * * *

   *         *         *         *         *         *         *

   **14.   DEED AND ABSTRACT BILL OF SALE.**   If all said sums of money and interest are paid to Sellers during the life of this contract, and all other agreements for performance by Buyers have been complied with, Sellers will execute and deliver to Buyers a_____ Warranty Deed conveying said premises in fee simple pursuant to and in conformity with this contract and Sellers will at this time deliver to Buyers an abstract showing merchantable title in conformity with this contract. * * *

The record does not establish why the blank appeared in paragraph 14 of the real estate installment document or that that blank was completed.

At no time before the trial in these cases did petitioners execute a deed in favor of Consulting with respect to the Sundrup residence.  Petitioners continued to reside in the Sundrup residence after Consulting and they executed the real estate installment document.  At no time before the trial in these cases was there a sign on the Sundrup residence indicating that Con-

sulting engaged in any activity there.  The only visible indication at the Sundrup residence of the identity of the owner of that residence was a rock on which appeared the name "Sundrup".

Consulting did not pay timely the $19,562.93 that the real estate installment document stated Consulting was to pay to the Sundrups on May 1 of each of the years at issue.  Instead, Consulting paid to the Sundrups on the dates indicated the following amounts that it, and they, described as payments of "interest" and "principal":

| Date | Consulting's Purported Interest Payments | Consulting's Purported Principal Payments | Total |
|------|------------------------------------------|-------------------------------------------|-------|
| May 17, 2003 | $10,391.06 | $9,171.87 | $19,562.93 |
| May 20, 2004 | 9,840.75 | 9,722.18 | 19,562.93 |
| May 18, 2005 | 9,257.42 | 10,305.51 | 19,562.93 |

(We shall refer to any, some, or all of the above-listed (1) purported interest payments as Consulting's purported interest payments, (2) purported principal payments as Consulting's purported principal payments, and (3) Consulting's total purported interest and principal payments as Consulting's purported interest and principal payments.)

In addition to Consulting's purported interest and principal payments described above, Consulting paid during each of its taxable years ended March 31, 2004 through 2006, virtually all of the expenses relating to the Sundrup residence, including (1) respective real property taxes of $1,096, $1,116, and $1,126

that Consulting paid during its taxable years ended March 31,
2004, 2005, and 2006,[38] (2) respective repairs and maintenance of
$1,607.09,[39] $2,326.58, and $4,671.28 that Consulting paid during
its taxable years ended March 31, 2004, 2005, and 2006,[40]
(3) respective utilities of $2,939.71, $2,852.21, and $2,668.77
that Consulting paid during its taxable years ended March 31,
2004, 2005, and 2006,[41] and (4) respective homeowner's and um-
brella insurance of $1,097, $1,096, and $1,785 that Consulting
paid during its taxable years ended March 31, 2004, 2005, and
2006.[42]  (We shall refer to any, some, or all of the above-stated

---

[38]We shall refer to any, some, or all of the above-stated
payments for real property taxes that Consulting made as Consult-
ing's payments of the Sundrup residence real property taxes.

[39]The parties made various mathematical errors in stipulat-
ing the respective total amounts of certain types of expenses
that Consulting paid during Consulting's taxable years ended Mar.
31, 2004 through 2006.  Those erroneous stipulations are clearly
contrary to the facts that we have found are established by the
record in these cases.  We have found the correct respective
total amounts of expenses that Consulting paid during Consult-
ing's taxable years ended Mar. 31, 2004 through 2006, which are
established by the record.  See Cal-Maine Foods, Inc. v. Commis-
sioner, 93 T.C. at 195.

[40]We shall refer to any, some, or all of the above-stated
payments for repairs and maintenance that Consulting made as
Consulting's payments of the Sundrup residence repairs and
maintenance.

[41]We shall refer to any, some, or all of the above-stated
payments made for utilities that Consulting made as Consulting's
payments of the Sundrup residence utilities.

[42]We shall refer to any, some, or all of the above-stated
payments for homeowner's and umbrella insurance that Consulting
(continued...)

amounts that Consulting paid for virtually all of the expenses relating to the Sundrup residence as Consulting's payments of the Sundrup residence expenses.)

### Certain Payments Made by Consulting for Food

During each of Consulting's taxable years ended March 31, 2004 through 2006, Ms. Sundrup purchased food at area grocery stores, which she used to prepare meals for herself and her family and for which Consulting paid.[43] During its taxable years ended March 31, 2004, 2005, and 2006, Consulting paid $4,869.81, $4,149.66, and $5,590.75, respectively, for that food. (We shall refer to any, some, or all of the above-stated amounts that Consulting paid for food that Ms. Sundrup purchased to prepare meals for herself and her family as Consulting's payments of the Sundrups' food.)

### Certain Payments Made by Consulting for Medical and Dental Expenses

On May 1, 2000, Consulting executed a document entitled "NONDISCRIMINATORY MEDICAL AND DENTAL REIMBURSEMENT PLAN". That document stated in pertinent part:

---

[42](...continued) made as Consulting's payments of the Sundrup residence insurance.

[43]In some instances, Ms. Sundrup paid for the food that she purchased using checks drawn on Consulting's checking account, Consulting's credit card, or her personal funds for which Consulting reimbursed her.

1.  <u>Purposes of Plan</u>  The purposes of the Plan are:

>   (a)  To encourage employees to continue their
>   association with the Company [Consulting].
>
>   (b)  To attract additional employees.

>   *       *       *       *       *       *       *

2.  <u>Eligibility</u>.  All employees who have been with the Company for six (6) months, or since the Company was incorporated, whichever is shorter, provided, however, that seasonal employees, employees covered by a collective bargaining agreement, or non-resident alien employees shall not be eligible.

3.  <u>Benefits</u>.  The Company will reimburse all eligible employees for all reasonable medical and dental expenses up to the sum of $5,000.00 in any fiscal year (including, but not limited to the cost of any accident, health or medical or dental insurance policy) which the eligible employee and/or members of his immediate family may incur, except such expenses as may be covered and are reimbursable to them from any medical, dental, health and/or accident insurance policy insuring them.

On May 1, 2000, Consulting and Mr. Sundrup executed a document entitled "AGREEMENT", "NONDISCRIMINATORY MEDICAL AND DENTAL REIMBURSEMENT PLAN" (Mr. Sundrup's purported medical and dental agreement), and Consulting and Ms. Sundrup executed a document with the same title (Ms. Sundrup's purported medical and dental agreement).  Mr. Sundrup signed Mr. Sundrup's purported medical and dental agreement both in his individual capacity and as president of Consulting.  Ms. Sundrup signed Ms. Sundrup's purported medical and dental agreement in her individual capacity, and Mr. Sundrup signed that document as president of Consulting.

Except as noted below, Mr. Sundrup's purported medical and dental agreement and Ms. Sundrup's purported medical and dental agreement contained essentially the same provisions. They stated in pertinent part:

> This will serve to confirm the understanding and agreement between you [Mr. Sundrup in the case of Mr. Sundrup's purported medical and dental agreement and Ms. Sundrup in the case of Ms. Sundrup's purported medical and dental agreement] and the undersigned (hereinafter "Corporation") [Consulting].
>
> 1. The Corporation has adopted a Nondiscriminatory Medical and Dental Reimbursement Plan. Pursuant to such Plan and for so long as you [Mr. Sundrup in the case of Mr. Sundrup's purported medical and dental agreement and Ms. Sundrup in the case of Ms. Sundrup's purported medical and dental agreement] are employed by the Corporation, the Corporation agrees to reimburse you for all reasonable medical and dental expenses up to the sum of $5,000.00 in any fiscal year (including but not limited to the cost of any accident, health, medical or dental insurance policy) which you and/or members of your immediate family may incur, except such expenses which are covered and are reimbursable to you from any medical, dental, health and/or accident insurance policy insuring you and/or members of your immediate family.

During each of Consulting's taxable years ended March 31, 2004 through 2006, Consulting paid the following medical and dental expenses of Mr. Sundrup and/or Ms. Sundrup: (1) Premiums for certain health insurance plans, (2) copayments to certain health care providers, and (3) miscellaneous medical and dental expenses. Those payments totaled $4,830.79, $8,838.76, and $11,455.26 during Consulting's taxable years ended March 31, 2004, 2005, and 2006, respectively. (We shall refer to any,

some, or all of the above-stated medical and dental expenses of the Sundrups that Consulting paid as Consulting's payments of the Sundrups' medical and dental expenses.)

On June 24, 2004, Consulting made payments totaling $2,029.88 on behalf of Mr. and Ms. Sundrup to a company known as American Federal Assurance for expenses relating to nursing home care (Consulting's payments of the Sundrups' expenses relating to nursing home care).[44]

                    Certain Payments Made by Consulting
                    for Expenses Relating to Certain
                    Vehicles Used by the Sundrups

On March 31, 2000, almost two months before Mr. and Ms. Sundrup incorporated Consulting, Mr. and Ms. Sundrup transferred the 1997 Cadillac automobile and the 2000 GMC truck to it.[45]

On September 1, 2000, Consulting traded the 1997 Cadillac automobile for a 2000 Cadillac automobile (2000 Cadillac automobile). During Consulting's taxable years ended March 31, 2004 through 2006, Ms. Sundrup, who drove the 2000 Cadillac automobile during those years, used that vehicle to buy food for her family and for other personal purposes.

---

[44]On June 24, 2004, Consulting paid $330.75 to the Iowa Motor Truck Association for "Annual dues" (Consulting's payment to the Iowa Motor Truck Association for annual dues).

[45]Although the parties stipulated that the date on which the Sundrups transferred the two vehicles in question to Consulting was Mar. 31, 2000, the record does not explain how they could have made those transfers to Consulting on a date before Consulting was incorporated.

On February 14, 2004, Consulting traded the 2000 GMC truck for a 2004 GMC Envoy (2004 GMC Envoy). During Consulting's taxable years ended March 31, 2004 through 2006, Mr. Sundrup, who drove the 2004 GMC Envoy during those years, used that vehicle, inter alia, to (1) buy with Ms. Sundrup food for their family, (2) haul parts for Transfer's trucking business, (3) buy tools for use in Transfer's trucking business, and (4) travel with Ms. Sundrup to Branson, Missouri, in order to make certain repairs and improvements to Unit 4, Unit 5, and/or Unit 6.

During each of Consulting's taxable years ended March 31, 2004 through 2006, Consulting paid expenses relating to the respective vehicles that the Sundrups used during those years. Those payments totaled $2,871.73, $1,776.75, and $1,622.08 during Consulting's taxable years ended March 31, 2004, 2005, and 2006, respectively. (We shall refer to any, some, or all of the above-stated expenses that Consulting paid relating to the respective vehicles that the Sundrups used during Consulting's taxable years ended March 31, 2004 through 2006, as Consulting's payments of the Sundrups' vehicle expenses.)

Certain Payments Made by
Consulting for Office Expenses

During each of Consulting's taxable years ended March 31, 2004 through 2006, Consulting paid certain expenses consisting (1) primarily of expenses for subscriptions to periodicals, such as Popular Science, Reader's Digest, and Good Housekeeping, and

(2) certain supplies.  Those payments totaled $821.05, $288.11,
and $476.93 during Consulting's taxable years ended March 31,
2004, 2005, and 2006, respectively. (We shall refer to any, some,
or all of the above-stated office expenses that Consulting paid
as Consulting's payments of office expenses.)

Summary of Certain Amounts That Consulting
Received, Paid, or Claimed as Depreciation

The following chart summarizes certain amounts that Consult-
ing received, paid, or claimed as depreciation (discussed
below):[46]

_____

[46]The amount listed below as "Depreciation claimed" includes
sec. 179 expense.

| Amounts Received | Taxable Year Ended Mar. 31 | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| Transfer's payments to Consulting | $45,500.00 | $38,500.00 | $42,000.00 |
| Leasing's payments to Consulting | 18,000.00 | 13,000.00 | 9,000.00 |
| Total amounts received by Consulting | 63,500.00 | 51,500.00 | 51,000.00 |
| | | | |
| **Amounts Paid** | | | |
| Consulting's purported interest and principal payments | $19,562.93 | $19,562.93 | $19,562.93 |
| Consulting's payments of the Sundrup residence real property taxes | 1,096.00 | 1,116.00 | 1,126.00 |
| Consulting's payments of the Sundrup residence repairs and maintenance | 1,607.09 | 2,326.58 | 4,671.28 |
| Consulting's payments of the Sundrup residence utilities | 2,939.71 | 2,852.21 | 2,668.77 |
| Consulting's payments of the Sundrup residence insurance | 1,097.00 | 1,096.00 | 1,785.00 |
| Consulting's payments of the Sundrups' food | 4,869.81 | 4,149.66 | 5,590.75 |
| Consulting's payments of the Sundrups' medical and dental expenses | 4,830.79 | 8,838.76 | 11,455.26 |
| Consulting's payments of the Sundrups' expenses relating to nursing home care | -- | 2,029.88 | -- |
| Consulting's payment to the Iowa Motor Truck Association for annual dues | -- | 330.75 | -- |
| Consulting's payments of the Sundrups' vehicle expenses | 2,871.73 | 1,776.75 | 1,622.08 |
| Consulting's payments of office expenses | 821.05 | 288.11 | 476.93 |
| Total amounts Consulting paid | 39,696.11 | 44,367.63 | 48,959.00 |
| | | | |
| **Amounts Claimed as Depreciation** | | | |
| Depreciation claimed | $27,374.00 | $15,226.00 | $12,326.00 |
| | | | |
| Total Amounts Consulting Paid and Claimed as Depreciation | 67,070.11 | 59,593.63 | 61,285.00 |

(We shall refer collectively to Consulting's purported interest and principal payments, Consulting's payments of the Sundrup residence expenses, Consulting's payments of the Sundrups' food, Consulting's payments of the Sundrups' medical and dental expenses, Consulting's payments of the Sundrups' expenses relating to nursing home care, Consulting's payment to the Iowa Motor Truck Association for annual dues, Consulting's payments of the Sundrups' vehicle expenses, and Consulting's payments of office expenses as Consulting's payments of the Sundrups' expenses.)

Tax Returns

The Sundrups' Tax Returns

For their taxable year 1999 and an undisclosed number of years before that taxable year, the Sundrups used an accountant[47] (Sundrup accountant), who was with the accounting firm Olsen Muhlbauer, to prepare their tax returns.  Sometime during their taxable year 2000, the Sundrups informed the Sundrup accountant that they intended to incorporate Ron Sundrup Transfer.

Sometime after the Sundrups used the Sundrup accountant to prepare their tax return for their taxable year 1999, they stopped using him to prepare their tax returns.  The Sundrup accountant did not prepare any tax returns for (1) the Sundrups for their taxable years 2000 through 2005, (2) Transfer for its taxable years ended March 31, 2001 through 2006, (3) Consulting

---

[47]The record does not identify the accountant who prepared petitioners' tax returns for certain years before 2000.

for its taxable years ended March 31, 2001 through 2006, and

(4) Leasing for its taxable years 2000 through 2005.

Mr. and Ms. Sundrup jointly filed Form 1040, U.S. Individual
Income Tax Return, for each of their taxable years 2003
(Sundrups' 2003 return), 2004 (Sundrups' 2004 return), and 2005
(Sundrups' 2005 return), which Mr. Pechacek[48] signed as return
preparer.

In the Sundrups' 2003 return, Mr. and Ms. Sundrup reported
"**total income**" of $61,454.  In calculating that total income, Mr.
and Ms. Sundrup claimed (1) $16,737 of "**Taxable** interest", which
included Consulting's purported interest payments of $10,391.06[49]
that the Sundrups received during their taxable year 2003, and
(2) a loss attributable to Leasing of $4,720 (Sundrups' 2003
Schedule E Leasing claimed loss) from Schedule E, Supplemental
Income and Loss (Schedule E), that petitioners included with the
Sundrups' 2003 return.

The Sundrups' 2003 Schedule E Leasing claimed loss of $4,720
was the amount of the loss "from rental real estate activities"
that Leasing claimed in Schedule K, Partners' Shares of Income,
Credits, Deductions, etc. (2003 Leasing Schedule K claimed loss),

---

[48]See supra note 11.

[49]The Sundrups, as well as Transfer and Consulting, rounded
to the nearest dollar the amounts claimed in the respective tax
returns that they filed for their respective taxable years at
issue.

that Leasing included with Form 1065, U.S. Return of Partnership Income (Form 1065), which it filed for its taxable year 2003 and which Mr. Pechacek signed as return preparer.[50] In calculating that loss "from rental real estate activities", Leasing claimed (1) a deduction of $30,000 for Leasing's promissory note to Consulting dated December 30, 2003 and (2) a deduction for certain expenses (e.g., real property taxes, insurance, repairs, and depreciation) with respect to the North House and the South House (deduction for expenses relating to the North House and the South House).[51]

Leasing provided to each of the Sundrups Schedule K-1, Partner's Share of Income, Credits, Deductions, etc. (Schedule K-1), for Leasing's taxable year 2003 in which Leasing showed each of their shares of the 2003 Leasing Schedule K claimed loss of $4,720. The Sundrups' 2003 Schedule E Leasing claimed loss of $4,720 that the Sundrups claimed in calculating "total income"

_____

[50]At all relevant times, Leasing used the cash method of accounting for tax purposes. At no time before the trial in these cases did Leasing file (1) Form 8832, Entity Classification Election, in which it elected to be taxed as a corporation or (2) Form 8893, Election of Partnership Level Tax Treatment, or any other election statement under sec. 6231(a)(1)(B)(ii), in which it elected partnership-level tax treatment. As a result, at all relevant times, including during the years at issue, Leasing was treated as a passthrough entity for tax purposes.

[51]The record does not establish the amount, if any, that Leasing paid for expenses relating to the North House and the South House during its taxable year 2003.

that they reported in the Sundrups' 2003 return was equal to the total of the amounts shown in those two 2003 Schedules K-1.

In the Sundrups' 2004 return, Mr. and Ms. Sundrup reported "**total income**" of $38,044. In calculating that total income, Mr. and Ms. Sundrup claimed (1) $15,344 of "**Taxable** interest", which included Consulting's purported interest payments of $9,840.75 that the Sundrups received during their taxable year 2004, and (2) a loss attributable to Leasing of $11,258 (Sundrups' 2004 Schedule E Leasing claimed loss) from Schedule E that petitioners included with the Sundrups' 2004 return.

The Sundrups' 2004 Schedule E Leasing claimed loss of $11,258 was the amount of the loss from "rental real estate" activities that Leasing claimed in Schedule K, Partners' Distributive Share Items (2004 Leasing Schedule K claimed loss), that Leasing included with Form 1065 which it filed for its taxable year 2004 and which Mr. Pechacek signed as return preparer. In calculating that loss from "rental real estate" activities, Leasing claimed (1) a deduction of $12,000 for Leasing's payments to Consulting that were made in Leasing's taxable year 2004 and (2) a deduction for expenses relating to the North House and the South House.[52]

_____

[52]The record does not establish the amount, if any, that Leasing paid for expenses relating to the North House and the South House during its taxable year 2004.

Leasing provided to each of the Sundrups Schedule K-1 for Leasing's taxable year 2004 in which Leasing showed each of their shares of the 2004 Leasing Schedule K claimed loss of $11,258. The 2004 Schedule E Leasing claimed loss of $11,258 that the Sundrups claimed in calculating "total income" that they reported in the Sundrups' 2004 return was equal to the total of the amounts shown in those two 2004 Schedules K-1.

In the Sundrups' 2005 return, Mr. and Ms. Sundrup reported "**total income**" of $82,605. In calculating that total income, Mr. and Ms. Sundrup claimed (1) $13,687 of "**Taxable** interest", which included Consulting's purported interest payments of $9,257.42 that the Sundrups received during their taxable year 2005, and (2) a loss attributable to Leasing of $1,830 (Sundrups' 2005 Schedule E Leasing claimed loss) from Schedule E that petitioners included with the Sundrups' 2005 return.

The Sundrups' 2005 Schedule E Leasing claimed loss of $1,830 was the amount of the loss from "rental real estate" activities that Leasing claimed in Schedule K, Partners' Distributive Share Items (2005 Leasing Schedule K claimed loss), that Leasing included with Form 1065 which it filed for its taxable year 2005 and which Mr. Pechacek signed as return preparer. In calculating that loss from "rental real estate" activities, Leasing claimed (1) a deduction of $10,000 for Leasing's payments to Consulting

that were made in Leasing's taxable year 2005 and (2) a deduction for expenses relating to the North House and the South House.[53]

Leasing provided to each of the Sundrups Schedule K-1 for Leasing's taxable year 2005 in which Leasing showed each of their shares of the 2005 Leasing Schedule K claimed loss of $1,830. The Sundrups' 2005 Schedule E Leasing claimed loss of $1,830 that the Sundrups claimed in calculating "total income" that they reported in the Sundrups' 2005 return was equal to the total of the amounts shown in those two 2005 Schedules K-1.

Transfer's Tax Returns

Transfer filed Form 1120, U.S. Corporation Income Tax Return (Form 1120), for each of its taxable years ended March 31, 2004 (Transfer's TYE 3/31/04 return), March 31, 2005 (Transfer's TYE 3/31/05 return), and March 31, 2006 (Transfer's TYE 3/31/06 return), which Mr. Pechacek signed as return preparer.[54]

In Transfer's TYE 3/31/04 return, Transfer claimed "**Taxable income**" of negative $4,487, or a loss of $4,487.  In calculating

---

[53]The record does not establish the amount, if any, that Leasing paid for expenses relating to the North House and the South House during its taxable year 2005.

We shall refer collectively to the respective deductions for expenses relating to the North House and the South House that Leasing claimed for its taxable years 2003, 2004, and 2005 as Leasing's claimed deductions for expenses relating to the North House and the South House.

[54]At all relevant times Transfer used the cash method of accounting for tax purposes.

that loss, Transfer claimed in Transfer's TYE 3/31/04 return

(1) a deduction of $45,326[55] for Transfer's payments to Consulting

that Transfer made during Transfer's taxable year ended March 31,

2004, (2) a deduction of $13,322 for "Employee benefit programs",

which included Transfer's payments of the Sundrups' medical and

dental expenses made during that taxable year, and (3) a deduc-

tion of $485 for "MISCELLANEOUS" expenses (miscellaneous ex-

penses).[56]

In Transfer's TYE 3/31/05 return, Transfer claimed zero

"**Taxable income**".  In calculating that taxable income, Transfer

claimed in Transfer's TYE 3/31/05 return a deduction of $39,602

for Transfer's payments to Consulting that Transfer made during

Transfer's taxable year ended March 31, 2005.

In Transfer's TYE 3/31/06 return, Transfer claimed "**Taxable

income**" of negative $4,248, or a loss of $4,248.  In calculating

that loss, Transfer claimed in Transfer's TYE 3/31/06 return

(1) a deduction of $43,639 for Transfer's payments to Consulting

---

[55]We have found above that Transfer's payments to Consulting that Transfer made during Transfer's taxable year ended Mar. 31, 2004, totaled $45,500.

[56]The record does not establish that Transfer paid $485 of miscellaneous expenses during Transfer's taxable year ended Mar. 31, 2004.

that Transfer made during Transfer's taxable year ended March 31, 2006, and (2) a deduction of $696 for miscellaneous expenses.[57]

Consulting's Tax Returns

Consulting filed Form 1120 for each of its taxable years ended March 31, 2004 (Consulting's TYE 3/31/04 return), March 31, 2005 (Consulting's TYE 3/31/05 return), and March 31, 2006 (Consulting's TYE 3/31/06 return), which Mr. Pechacek signed as return preparer.

In Consulting's TYE 3/31/04 return, Consulting claimed zero "**Taxable income**".  In calculating that taxable income, Consulting reported as "Gross receipts or sales" $60,000 of Transfer's payments to Consulting and Leasing's payments to Consulting that Transfer and Leasing made during Consulting's taxable year ended March 31, 2004.[58]  In calculating the zero taxable income that Consulting claimed in Consulting's TYE 3/31/04 return, Consulting deducted (1) Consulting's payments of the Sundrups' food of $4,870 that Consulting made during its taxable year ended March

---

[57]The record does not establish that Transfer paid $696 of miscellaneous expenses during Transfer's taxable year ended Mar. 31, 2006.

[58]Consulting claimed in Consulting's TYE 3/31/04 return, and the parties stipulated, that the total amount that Consulting received from Transfer and Leasing during Consulting's taxable year ended Mar. 31, 2004, was $60,000.  We have found on the basis of the parties' stipulations that Transfer and Leasing paid to Consulting during Consulting's taxable year ended Mar. 31, 2004, a total of $63,500.  The record does not explain that discrepancy.

31, 2004, (2) Consulting's payments of the Sundrups' medical and dental expenses of $4,830.79 that Consulting made during its taxable year ended March 31, 2004, (3) depreciation of $27,374,[59] (4) Consulting's payments of the Sundrups' vehicle expenses of $2,872 that Consulting made during its taxable year ended March 31, 2004, (5) Consulting's payments of office expenses of $821 that Consulting made during its taxable year ended March 31, 2004, (6) $10,391 of "INTEREST ON REK", which was the amount of Consulting's purported interest payments that it made to the Sundrups during Consulting's taxable year ended March 31, 2004, (7) Consulting's payments of the Sundrup residence real property taxes of $1,096 that Consulting made during its taxable year ended March 31, 2004, (8) Consulting's payments of the Sundrup residence repairs and maintenance of $1,815 that Consulting made during its taxable year ended March 31, 2004, (9) Consulting's payments of the Sundrup residence utilities of $2,940 that Consulting made during its taxable year ended March 31, 2004, and

---

[59]Consulting included Form 4562, Depreciation and Amortization (Form 4562), with Consulting's TYE 3/31/04 return. In that form, it claimed (1) total depreciation of $5,165 for the 1997 Cadillac automobile, 2000 Cadillac automobile, 2000 GMC truck, and 2004 GMC Envoy and (2) sec. 179 expense of $14,500 for the 2004 GMC Envoy. However, we have found that Consulting traded (1) the 1997 Cadillac automobile on Sept. 1, 2000, for the 2000 Cadillac automobile and (2) the 2000 GMC truck on Feb. 14, 2004, for the 2004 GMC Envoy. Consulting did not report depreciation recapture with respect to the 2000 GMC truck in Consulting's TYE 3/31/04 return. In Form 4562 included with Consulting's TYE 3/31/04 return, Consulting also claimed $6,908 of depreciation with respect to the Sundrup residence, including the land.

(10) Consulting's payments of the Sundrup residence insurance of $1,097 that Consulting made during its taxable year ended March 31, 2004.[60]

In Consulting's TYE 3/31/05 return, Consulting claimed "**Taxable income**" of negative $5,654, or a loss of $5,654. In calculating that loss, Consulting reported as "Gross receipts or sales" $51,500, which was the total of Transfer's payments to Consulting and Leasing's payments to Consulting that Transfer and Leasing made during Consulting's taxable year ended March 31, 2005. In calculating the loss of $5,654 that Consulting claimed in Consulting's TYE 3/31/05 return, Consulting deducted (1) Consulting's payments of the Sundrups' food of $4,072 that Consulting made during its taxable year ended March 31, 2005,[61] (2) Consulting's payments of the Sundrups' medical and dental expenses of $10,904 that Consulting made during its taxable year ended March 31, 2005, (3) depreciation of $15,226,[62] (4) Consult-

---

[60]In calculating the zero "taxable income" that Consulting claimed in Consulting's TYE 3/31/04 return, Consulting claimed certain additional deductions that respondent determined to disallow. We do not discuss those additional disallowed deductions. That is because Consulting does not contest them.

[61]We have found that Consulting's payments of the Sundrups' food that Consulting made during Consulting's taxable year ended Mar. 31, 2005, totaled $4,149.66.

[62]Consulting included Form 4562 with Consulting's TYE 3/31/05 return. In that form, it claimed total depreciation of $6,502 for the 1997 Cadillac automobile, 2000 Cadillac automobile, 2000 GMC truck, and 2004 GMC Envoy. However, we have found that Consulting traded (1) the 1997 Cadillac automobile on
(continued...)

ing's payments of the Sundrups' vehicle expenses of $1,857 that Consulting made during its taxable year ended March 31, 2005, (5) Consulting's payments of office expenses of $302 that Consulting made during its taxable year ended March 31, 2005, (6) $9,841 of "INTEREST ON REK", which was the amount of Consulting's purported interest payments that it made to the Sundrups during Consulting's taxable year ended March 31, 2005, (7) Consulting's payments of the Sundrup residence real property taxes of $1,116 that Consulting made during its taxable year ended March 31, 2005, (8) Consulting's payments of the Sundrup residence repairs and maintenance of $2,342 that Consulting made during its taxable year ended March 31, 2005, (9) Consulting's payments of the Sundrup residence utilities of $2,852 that Consulting made during its taxable year ended March 31, 2005, and (10) Consulting's payments of the Sundrup residence insurance of $1,096 that Consulting made during its taxable year ended March 31, 2005.[63]

---

[62](...continued)
Sept. 1, 2000, for the 2000 Cadillac automobile and (2) the 2000 GMC truck on Feb. 14, 2004, for the 2004 GMC Envoy. In Form 4562 included with Consulting's TYE 3/31/05 return, Consulting also claimed $6,908 of depreciation with respect to the Sundrup residence, including the land.

[63]In calculating the zero "taxable income" that Consulting claimed in Consulting's TYE 3/31/05 return, Consulting claimed certain additional deductions that respondent determined to disallow. We do not discuss those additional disallowed deductions. That is because Consulting does not contest them.

In Consulting's TYE 3/31/06 return, Consulting claimed zero "**Taxable income**". In calculating that taxable income, Consulting reported as "Gross receipts or sales" $53,000 of Transfer's payments to Consulting and Leasing's payments to Consulting that Transfer and Leasing made during Consulting's taxable year ended March 31, 2006.[64] In calculating the zero taxable income that Consulting claimed in Consulting's TYE 3/31/06 return, Consulting deducted (1) Consulting's payments of the Sundrups' food expenses of $5,491 that Consulting made during its taxable year ended March 31, 2006,[65] (2) Consulting's payments of the Sundrups' medical and dental expenses of $11,084 that Consulting made during its taxable year ended March 31, 2006,[66] (3) depreciation of $12,326,[67] (4) Consulting's payments of the Sundrups' vehicle

_____

[64]Consulting claimed in Consulting's TYE 3/31/06 return, and the parties stipulated, that the total amount that Consulting received from Transfer and Leasing during Consulting's taxable year ended Mar. 31, 2006, was $53,000. We have found on the basis of the parties' stipulations that Transfer and Leasing paid to Consulting during Consulting's taxable year ended Mar. 31, 2006, a total of $51,000. The record does not explain that discrepancy.

[65]We have found that Consulting's payments of the Sundrups' food that Consulting made during Consulting's taxable year ended Mar. 31, 2006, totaled $5,590.75.

[66]We have found that Consulting's payments of the Sundrups' medical and dental expenses that Consulting made during Consulting's taxable year ended Mar. 31, 2006, totaled $11,455.26.

[67]Consulting included Form 4562 with Consulting's TYE 3/31/06 return. In that form, it claimed total depreciation of $4,328 for the 1997 Cadillac automobile, 2000 Cadillac automobile, 2000 GMC truck, and 2004 GMC Envoy. However, we have found
(continued...)

expenses of $3,151 that Consulting made during its taxable year ended March 31, 2006, (5) Consulting's payments of office expenses of $477 that Consulting made during its taxable year ended March 31, 2006, (6) $9,257 of "INTEREST ON REK", which was the amount of Consulting's purported interest payments that it made to the Sundrups during Consulting's taxable year ended March 31, 2006, (7) Consulting's payments of the Sundrup residence real property taxes of $1,126 that Consulting made during its taxable year ended March 31, 2006, (8) Consulting's payments of the Sundrup residence repairs and maintenance of $4,671 that Consulting made during its taxable year ended March 31, 2006, (9) Consulting's payments of the Sundrup residence utilities of $2,719 that Consulting made during its taxable year ended March 31, 2006, and (10) Consulting's payments of the Sundrup residence insurance of $1,127[68] that Consulting made during its taxable year ended March 31, 2006.[69]

---

[67](...continued)
that Consulting traded (1) the 1997 Cadillac automobile on Sept. 1, 2000, for the 2000 Cadillac automobile and (2) the 2000 GMC truck on Feb. 14, 2004, for the 2004 GMC Envoy. In Form 4562 included with Consulting's TYE 3/31/06 return, Consulting also claimed $6,908 of depreciation with respect to the Sundrup residence, including the land.

[68]We have found that Consulting's payments of the Sundrup residence insurance that were made during Consulting's taxable year ended Mar. 31, 2006, totaled $1,785.

[69]In calculating the zero "taxable income" that Consulting claimed in Consulting's TYE 3/31/06 return, Consulting claimed certain additional deductions that respondent determined to dis-
(continued...)

Notices of Deficiency

Respondent conducted respective examinations of (1) the Sundrups' taxable years 2003 through 2005, (2) Leasing's taxable years 2003 through 2005, (3) Transfer's taxable years ended March 31, 2004 through 2006, and (4) Consulting's taxable years ended March 31, 2004 through 2006.  As a result of those examinations, respondent issued separate notices of deficiency to the Sundrups, Transfer, and Consulting.

The Sundrups' Notice

Respondent issued to Mr. and Ms. Sundrup a notice of deficiency (notice) with respect to their taxable years 2003 through 2005 (Sundrups' notice).  In that notice, respondent excluded from the Sundrups' gross income the following amounts of Consulting's purported interest payments that they reported as "Interest Income" for their taxable years indicated:

---

[69](...continued)
allow.  We do not discuss those additional disallowed deductions. That is because Consulting does not contest them.

|                | Consulting's Purported Interest |
| Taxable Year | Payments Excluded From Gross Income |
| 2003 | $10,391 |
| 2004 | 9,841 |
| 2005 | 9,257 |

In the Sundrups' notice, respondent also determined that the Sundrups are not entitled to deduct the following amounts of Schedule E claimed losses:

| Schedule E Claimed Loss Disallowed | Amount |
| --- | --- |
| Sundrups' 2003 Schedule E Leasing claimed loss | $4,720 |
| Sundrups' 2004 Schedule E Leasing claimed loss | 11,258 |
| Sundrups' 2005 Schedule E Leasing claimed loss | 1,830 |

In that notice, respondent also determined that the Sundrups have the following amounts of Schedule E "Total income" for their taxable years indicated:

| Taxable Year | Schedule E "Total income" |
| --- | --- |
| 2003 | $7,056 |
| 2004 | 6,743 |
| 2005 | 5,287 |

Respondent made the Sundrups' Schedule E determinations in the Sundrups' notice because respondent determined for the taxable years indicated (1) that Leasing is not entitled to the following amounts of Schedule K claimed losses and (2) that Leasing has the following amounts of "**Ordinary income (loss)** from trade or business activities":

| Taxable Year | Schedule K Claimed Loss Disallowed | **"Ordinary income (loss)** from trade or business activities" |
|---|---|---|
| 2003 | $4,720 | $7,056 |
| 2004 | 11,258 | 6,743 |
| 2005 | 1,830 | 5,287 |

Respondent made the Leasing Schedule K determinations in the Sundrups' notice because respondent determined that Leasing is not entitled to Leasing's claimed deductions relating to the North House and the South House of $11,776, $18,001, and $7,117 for its taxable years 2003, 2004, and 2005, respectively.

In the Sundrups' notice, respondent also determined that the Sundrups are liable for accuracy-related penalties under section 6662(a) in the respective amounts of $3,825.80, $3,591.20, and $2,999.80 for their taxable years 2003, 2004, and 2005 because of negligence or disregard of rules or regulations or a substantial understatement of tax.[70]

Transfer's Notice

Respondent issued to Transfer a notice with respect to its taxable years ended March 31, 2004 through 2006 (Transfer's notice). In that notice, respondent determined, inter alia, that Transfer is not entitled to deduct (1) $9,293 of the $13,322 that Transfer claimed as "Employee benefit programs" in Transfer's TYE 3/31/04 return, (2) $426 of the $485 of miscellaneous expenses

---

[70]Respondent made certain other determinations in the Sundrups' notice that we do not address because of our holdings with respect to certain alternative issues that respondent raised. See supra note 4 and infra note 75.

that Transfer deducted in Transfer's TYE 3/31/04 return, and
(3) $215 of the $696 of miscellaneous expenses that Transfer
deducted in Transfer's TYE 3/31/06 return.

In Transfer's notice, respondent also determined that Transfer is liable for accuracy-related penalties under section 6662(a) in the respective amounts of $472.20, $355.20, and $168.60 for its taxable years ended March 31, 2004 through 2006 because of negligence or disregard of rules or regulations or a substantial understatement of tax.

Consulting's Notice

Respondent issued to Consulting a notice with respect to its taxable years ended March 31, 2004 through 2006 (Consulting's notice). In that notice, respondent determined, inter alia, that Consulting is not entitled for the taxable years at issue to the following deductions[71] that it claimed for the payments indicated:

---

[71]Respondent also determined that Consulting is not entitled for each of its taxable years at issue to certain additional amounts of the deductions that it claimed for each of those years. We do not address those additional disallowed amounts. That is because Consulting does not contest them.

| Claimed Deduction | 2004 | 2005 | 2006 |
|---|---|---|---|
| Consulting's payments of the Sundrups' food | $4,870 | $4,072 | $5,491 |
| Consulting's payments of the Sundrups' medical and dental expenses | [1]4,831 | [1]8,839 | 11,084 |
| Depreciation and sec. 179 expense | 27,374 | 15,226 | 12,326 |
| Consulting's payments of the Sundrups' vehicle expenses | 2,872 | [1]1,777 | [1]1,622 |
| Consulting's payments of office expenses | 821 | [1]288 | [1]477 |
| Consulting's purported interest payments | 10,391 | [1]9,841 | 9,257 |
| Consulting's payments of the Sundrup residence real property taxes | 1,096 | 1,116 | 1,126 |
| Consulting's payments of the Sundrup residence repairs and maintenance | [1]1,607 | [1]2,327 | 4,671 |
| Consulting's payments of the Sundrup residence utilities | 2,940 | 2,852 | [1]2,669 |
| Consulting's payments of the Sundrup residence insurance | 1,097 | 1,096 | 1,127 |

[1]For convenience we have rounded to the nearest dollar the payments that Consulting made for the items indicated during each of its taxable years at issue.

In Consulting's notice, respondent also determined that Consulting is liable for accuracy-related penalties under section 6662(a) in the respective amounts of $2,006, $1,575, and $1,650, for its taxable years ended March 31, 2004 through 2006 because of negligence or disregard of rules or regulations or a substantial understatement of tax.

Amendments to Answers

The Sundrups

Respondent filed an amendment to answer in the Sundrups' case at docket No. 14373-07. Respondent alleged in that amendment to answer that the Sundrups have respective increases of $5,768, $1,044, and $549 in the respective deficiencies that respondent determined in the Sundrups' notice for their taxable years 2003, 2004, and 2005. Respondent made those allegations because respondent alleged in the amendment to answer that Leasing is not entitled to the respective deductions that it claimed for its taxable years 2003, 2004, and 2005 for Leasing's promissory note to Consulting dated December 30, 2003 and for Leasing's payments to Consulting. Respondent further alleged in that amendment to answer that the Sundrups have respective increases of $1,153.60, $208.80, and $109.80 to the accuracy-related penalties under section 6662(a) that respondent determined in the Sundrups' notice for their taxable years 2003, 2004, and 2005.

Transfer

Respondent filed an amendment to answer in Transfer's case at docket No. 14374-07. Respondent alleged in that amendment to answer that Transfer has respective increases of $5,556, $4,767, and $5,375 in the respective deficiencies that respondent determined in Transfer's notice for its taxable years ended March 31, 2004, March 31, 2005, and March 31, 2006. Respondent made those

allegations because respondent alleged in the amendment to answer that Transfer is not entitled to the respective deductions that it claimed for its taxable years ended March 31, 2004, 2005, and 2006, for Transfer's payments to Consulting. Respondent further alleged in that amendment to answer that Transfer has respective increases of $1,111.20, $953.40, and $1,075 to the accuracy-related penalties under section 6662(a) that respondent determined in Transfer's notice for its taxable years ended March 31, 2004, 2005, and 2006.

OPINION

Petitioners bear the burden of proving that the respective determinations in the Sundrups' notice, Transfer's notice, and Consulting's notice that remain at issue are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent bears the burden of proving any new matters that respondent alleged in the respective amendments to answers that respondent filed in the Sundrups' case at docket No. 14373-07 and Transfer's case at docket No. 14374-07. See Rule 142(a).

Before turning to the issues presented, we shall comment on the respective testimonies of Mr. Sundrup and Ms. Sundrup, who were the only witnesses at the trial in these cases. We found those testimonies to be in certain material respects questionable, implausible, vague, inconsistent, unpersuasive and/or self-serving. We shall not rely on the respective testimonies of Mr.

Sundrup and Ms. Sundrup in those respects.  See, e.g., <u>Tokarski</u>
<u>v. Commissioner</u>, 87 T.C. 74, 77 (1986).

<u>Certain Transactions at Issue</u>

It is respondent's position that the respective transactions
between (1) (a) Transfer and Consulting and (b) Leasing and
Consulting, under which Consulting purported to provide to each
of those companies certain services, and (2) the Sundrups and
Consulting, under which Consulting purported to agree to buy the
Sundrup residence, should not be respected for tax purposes.[72]  In
support of that position, respondent argues that there was no
nontax business purpose for any of those transactions and that
each of them was without economic substance and a sham.  Accord-
ing to respondent,

> When looking beyond the four corners of petitioners'
> documents, the evidence demonstrates that Transfer and
> Leasing's payments [to Consulting] of $63,500.00,
> $51,500.00, and $51,000.00 in Consulting's fiscal years
> ending March 31, 2004, March 31, 2005, and March 31,
> 2006, respectively, enabled Ronald and Helen Sundrup to
> live a tax-free lifestyle through Consulting's payment
> of their personal living expenses.  Those payments from
> Transfer and Leasing to Consulting, a corporation with-
> out any purpose beyond tax avoidance, should not be
> deductible.
>
> *     *     *     *     *     *     *
>
> Mr. and Mrs. Sundrup reported interest income on
> their 2003, 2004, and 2005 joint federal income tax
> returns in the amounts of $10,391.00, $9,841.00, and

_____

[72]We shall sometimes refer to the respective transactions
between (1) Transfer and Consulting, (2) Leasing and Consulting,
and (3) the Sundrups and Consulting as the respective transac-
tions at issue.

$9,257.00, respectively.  Respondent disallowed these
amounts, determining that the alleged sale of 200 Corn-
ing St. [the Sundrup residence] was part of a scheme to
deduct Mr. & Mrs. Sundrup's personal living expenses.
* * *

It is the position of petitioners that the respective trans-

actions at issue should be respected for tax purposes.  In sup-

port of that position, petitioners argue:

Sundrup Consulting, Sundrup Transfer, and Sundrup Leas-
ing were created primarily for corporate protection in
the form of premises liability.  The companies were not
a scheme to deduct personal expenses of Mr. and Mrs.
Sundrup. * * *

At trial, Mr. Sundrup claimed that the Sundrups incorporated

Consulting after they formed Transfer and Leasing "because I was

concerned of the liability against me in case something would

happen."  At trial, Ms. Sundrup claimed that the Sundrups incor-

porated Consulting after they formed Transfer and Leasing in

order to "have another pocket of liability protection."  As the

trier of fact, we are unwilling to rely on the respective testi-

monies of Mr. Sundrup and Ms. Sundrup as to why they incorporated

Consulting.

Based upon our examination of the entire record before us,

we find that the only intended objective of the respective trans-

actions between (1) (a) Transfer and Consulting and (b) Leasing

and Consulting, under which Consulting purported to provide to

each of those companies certain services, and (2) the Sundrups

and Consulting, under which Consulting purported to agree to buy

the Sundrup residence, was the Sundrups' tax-avoidance objective
of having Consulting pay the Sundrups' personal living expenses
with funds which Transfer and Leasing paid to Consulting and for
which Transfer and Leasing claimed tax deductions for their
respective taxable years at issue.[73]  On that record, we find that
the respective transactions at issue were not entered into for
nontax business reasons, were entered into only for tax-avoidance
reasons, and did not have economic substance.  See Frank Lyon Co.
v. United States, 435 U.S. 561 (1978); Gregory v. Helvering, 293
U.S. 465, 467 (1935); Rice's Toyota World, Inc. v. Commissioner,
81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89
(4th Cir. 1985); Van Zandt v. Commissioner, 40 T.C. 824 (1963),
affd. 341 F.2d 440 (5th Cir. 1965).

Based upon our examination of the entire record before us,
we hold that the respective transactions between (1) Transfer and
Consulting, (2) Leasing and Consulting, and (3) the Sundrups and
Consulting should not be respected for tax purposes.  As a re-
sult, we hold that (1) Transfer is not entitled for each of its

---

[73]In order to bolster the chances that they would succeed in
achieving their tax-avoidance objective, petitioners created a
paper trail consisting of the purported Transfer management
agreement, the purported Leasing management agreement, Mr.
Sundrup's purported employment agreement, Ms. Sundrup's purported
employment agreement, and the real estate installment document.
Those documents are nothing more than self-serving attempts by
petitioners to create a paper trail that they hoped would in-
crease the chances that they would succeed in achieving the
Sundrups' tax-avoidance objective.  On the record before us, we
find that none of the documents in question has economic reality
beyond tax planning.

taxable years at issue to deduct under section 162(a) Transfer's payments to Consulting during each of those years; (2) Leasing is not entitled for each of its taxable years at issue to deduct under section 162(a) Leasing's payments to Consulting during each of those years;[74] and (3) the Sundrups do not have for each of their taxable years at issue interest income because of Consulting's purported interest payments to them during each of those years.[75]

Transfer's Claimed Deduction
for Transfer's Payments of the
Sundrups' Medical and Dental Expenses

In Transfer's TYE 3/31/04 return, Transfer claimed a deduction of $9,293 for Transfer's payments of the Sundrups' medical and dental expenses during that year.  In Transfer's notice, respondent determined to disallow that deduction.[76]

Respondent argues that Transfer is not entitled to the deduction claimed for its taxable year ended March 31, 2004, for Transfer's payments of the Sundrups' medical and dental expenses

---

[74]See supra note 50.

[75]In the light of our holdings with respect to the respective transactions at issue, we need not address respondent's alternative position that Consulting's payments of the Sundrups' expenses during each of its taxable years at issue are nondeductible payments that constitute constructive dividends to the Sundrups.  See supra note 4.

[76]At trial, respondent's counsel indicated that respondent did not disallow in Transfer's notice the portion of the $13,322 claimed as "Employee benefit programs" in Transfer's TYE 3/31/04 return that was for medical and dental expenses of Rick Sundrup, the Sundrups' son.

because "Ronald Sundrup was not an employee [of Transfer] and cannot claim benefits under the plan. * * * Mrs. Sundrup never established that she was an employee of Transfer."

Mr. Sundrup testified inconsistently that during Transfer's taxable years at issue he was not an employee of Transfer and that he was an employee of Transfer. Ms. Sundrup claimed at trial that she was an employee of Transfer during at least part of its taxable year ended March 31, 2004. We are unwilling to rely on the respective testimonies of Mr. Sundrup and Ms. Sundrup regarding whether they were employees of Transfer during its taxable year ended March 31, 2004.

Respondent acknowledges that Mr. Sundrup and Ms. Sundrup "were in fact performing the daily work of Transfer" throughout its taxable years at issue, including its taxable year ended March 31, 2004. Respondent's contention is consistent with various findings that we have made. We have found that, as was true when the Sundrups operated Ron Sundrup Transfer, the Sundrups conducted the office operations of Transfer, which Ms. Sundrup managed, at the Sundrup residence. We have also found that, as was true when Ms. Sundrup managed the office operations of Ron Sundrup Transfer, as part of her managing the office operations of Transfer she answered the telephone, scheduled pickups, monitored deliveries, and coordinated jobs among the drivers. In addition, we have found that Mr. Sundrup served as a

driver for Transfer during its taxable years at issue.  He also did work during those years repairing, maintaining, and washing certain vehicles that Transfer used in its trucking business. Moreover, we have found that the transaction between Transfer and Consulting, under which Consulting purported to provide certain services to Transfer, should not be respected for tax purposes.

Based upon our examination of the entire record before us, we find that Mr. Sundrup and Ms. Sundrup each were employees of Transfer during its taxable year ended March 31, 2004.  On that record, we further find that Transfer is entitled for its taxable year ended March 31, 2004, to deduct under section 162(a) Transfer's payments of the Sundrups' medical and dental expenses during that year of $9,293.

Transfer's Claimed Deductions
for Miscellaneous Expenses

In Transfer's TYE 3/31/04 return and Transfer's TYE 3/31/06 return, Transfer claimed respective deductions of $485 and $696 for miscellaneous expenses.[77]  In Transfer's notice, respondent determined to disallow $426 and $215 of those respective deductions.

Transfer presented no evidence at trial, and makes no argument on brief, with respect to the respective deductions of $426 and $215 for miscellaneous expenses that Transfer claimed in Transfer's TYE 3/31/04 return and Transfer's TYE 3/31/06 return

---

[77]See supra notes 56 and 57.

and that respondent disallowed.  On the record before us, we find that Transfer is not entitled to those deductions.

Leasing's Claimed Deductions Relating
to the North House and the South House

In the respective Forms 1065 that it filed for its taxable years 2003, 2004, 2005, Leasing claimed deductions for expenses relating to the North House and the South House of $11,776, $18,001, and $7,117, respectively.[78]  In the Sundrups' notice, respondent determined to disallow those deductions.

The Sundrups presented no evidence at trial, and make no argument on brief, with respect to Leasing's claimed deductions for expenses relating to the North House and the South House.  On the record before us, we find that Leasing is not entitled to those deductions.[79]

Accuracy-Related Penalties

In the respective notices that respondent issued to the Sundrups, Transfer, and Consulting, respondent determined that they are liable for each of their respective taxable years at issue for accuracy-related penalties under section 6662(a) be-cause of (1) negligence or disregard of rules or regulations under section 6662(b)(1) or (2) a substantial understatement of tax under section 6662(b)(2).  In the respective amendments to answers that respondent filed in the Sundrups' case at docket No.

[78]See supra notes 51, 52, and 53.

[79]See supra note 50.

14373-07 and Transfer's case at docket No. 14374-07, respondent alleged that the Sundrups and Transfer are liable for increased accuracy-related penalties under section 6662(a) for each of their respective taxable years at issue.

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. See Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of the tax shown in the tax return. Sec. 6662(d)(2)(A). In the case of an individual, an understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown in the tax return for the

taxable year or $5,000.  Sec. 6662(d)(1)(A).  As pertinent here, in the case of a corporation other than an S corporation, an understatement is substantial (1) for taxable years that began on or before October 22, 2004, if it exceeds the greater of 10 percent of the tax required to be shown in the tax return for the taxable year or $10,000, sec. 6662(d)(1)(B), and (2) for taxable years that began after October 22, 2004, if it exceeds the lesser of (a) 10 percent of the tax required to be shown in the tax return for the taxable year or $10,000 or (b) $10 million, sec. 6662(d)(1)(B).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Reliance on the advice of a professional does not necessarily demonstrate reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.  Id.

Respondent bears the burden of production with respect to the accuracy-related penalties at issue.  See sec. 7491(c).  To meet respondent's burden of production, respondent must come forward with sufficient evidence showing that it is appropriate to impose the accuracy-related penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  With respect to the accuracy-related penalties that respondent determined in the respective notices that respondent issued to the Sundrups, Transfer, and Consulting, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues."  Id.

We have held that the respective transactions between (1) Transfer and Consulting, (2) Leasing and Consulting, and (3) the Sundrups and Consulting should not be respected for tax purposes.  As a result, we have further held that Transfer is not entitled for each of its taxable years at issue to deduct Transfer's payments to Consulting, that Leasing is not entitled for each of its taxable years at issue to deduct Leasing's payments to Consulting, and that the Sundrups do not have for each of their taxable years at issue interest income attributable to Consulting's purported interest payments to them.[80]  We have also held that Transfer is not entitled for each of its taxable years

---

[80]See supra note 75.

ended March 31, 2004 and 2006, to deduct claimed miscellaneous expenses. In addition, we have held that Leasing is not entitled for its taxable years 2003, 2004, and 2005 to Leasing's claimed deductions for expenses relating to the North House and the South House. Moreover, in the stipulation of settled issues filed on September 15, 2008 (stipulation of settled issues), Transfer conceded certain determinations that respondent made in Transfer's notice, and Consulting conceded one of the determinations that respondent made in Consulting's notice.[81]

In the light of our holdings stated above and the respective concessions of Transfer and Consulting in the stipulation of settled issues, the Sundrups, Transfer, and Consulting have respective underpayments of tax for their respective taxable years at issue. We conclude that respondent has satisfied respondent's burden of production under section 7491(c).

Petitioners argue that the Sundrups, Transfer, and Consulting are not liable for any of their respective taxable years at issue for accuracy-related penalties under section 6662(a). That is because, according to petitioners, they

> did not substantially understate income tax and did not act negligently or disregard rules or regulations. Petitioners had reasonable cause and acted in good faith. Petitioners have shown their transactions were legitimate business activities and not a scheme to deduct personal expenses. * * *

---

[81]At trial, petitioners made certain additional concessions.

On the record before us, we reject petitioners' claim that they had reasonable cause and acted in good faith in taking the tax return positions that they did with respect to the issues on which we have held against them and the respective issues that Transfer and Consulting conceded in the stipulation of settled issues.  With respect to the respective transactions at issue, we have held that those transactions should not be respected for tax purposes and that Transfer and Leasing are not entitled for their respective taxable years at issue to the respective deductions that they claimed as a result of those transactions.  With respect to Transfer's claimed respective deductions for miscellaneous expenses for its taxable years ended March 31, 2004 and 2006, we have held that Transfer is not entitled to those deductions.  With respect to Leasing's claimed deductions for expenses relating to the North House and the South House for its taxable years 2003, 2004, and 2005, we have held that Leasing is not entitled to those deductions.[82]  With respect to the respective determinations of respondent that Transfer and Consulting conceded in the stipulation of settled issues, those companies presented no evidence, and make no argument, with respect to the respective tax return positions that they took with respect to

---

[82]See _supra_ note 50.

the respective items that respondent determined are wrong and that they conceded.[83]

On the record before us, we find that the Sundrups, Transfer, and Consulting were negligent and disregarded rules or regulations, or otherwise did not do what a reasonable person would do, with respect to the respective items that resulted in their respective underpayments for each of their respective taxable years at issue.

On the record before us, we find that there was not reasonable cause for, and that the Sundrups, Transfer, and Consulting did not act in good faith with respect to, any portion of the respective underpayments of tax for each of their respective taxable years at issue.

Based upon our examination of the entire record before us, we find that the Sundrups, Transfer, and Consulting are liable for each of their respective taxable years at issue for accuracy-related penalties under section 6662(a) with respect to their respective underpayments of tax for each of those years.[84]

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[83]See _supra_ note 81.

[84]See _supra_ note 75.

To reflect the foregoing and the parties' respective conces-
sions,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.
